IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| AMERICA'S COLLECTIBLES NETWORK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:06-cv-260 |
| | ) | (VARLAN/SHIRLEY) |
| MIG BROADCAST GROUP, INC., and GUENTER MARKSTEINER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff America's Collectibles Network, Inc., d/b/a Jewelry Television ("ACN" or "Jewelry Television"), seeks compensatory damages against defendant, MIG Broadcast Group, Inc. ("MIG"), for breach of a written contract [*see* Doc. 22]. ACN also seeks treble damages against defendant Guenter Marksteiner for his role in interfering with that contract and for procuring that breach of contract [*see id.*]. In their answers, defendants contend that they have no liability whatsoever to ACN [*see* Docs. 29 and 30]. Moreover, MIG has filed a counterclaim, alleging that ACN is in breach of the parties' written agreement as well as an oral contract and, further, that ACN has made fraudulent and negligent misrepresentations which have resulted in damage to MIG [*see* Doc. 29].[1] Jurisdiction is predicated upon

---

[1]MIG's counterclaim is actually its second amended counterclaim filed on April 6, 2007, along with its answer to the amended complaint.

diversity of citizenship and the amount in controversy exceeding $75,000, *see* 28 U.S.C. § 1332(a)(1), and is not in dispute [*see* Doc. 56, p.1].

This matter is presently before the Court on ACN's motion for partial summary judgment against MIG only, seeking $1,600,362.37 in damages, plus prejudgment interest and attorney fees [*see* Doc. 25]. The issues raised have been exceptionally well briefed by the parties [*see* Docs. 27, 32, 35, and 41]. For the reasons that follow, ACN's motion will be denied.

## I.  *Facts*

A.  Plaintiff's Position.

The facts of this case will, of course, be viewed in the light most favorable to MIG, the non-moving party. Nevertheless, it must be emphasized that the facts relied on by ACN are mostly undisputed or are properly supported by the affidavit of Wally Nour, Jewelry Television's Manager of Financial Planning and Analysis [*see* Doc. 26]. As will become apparent, however, the Court cannot end its analysis based solely upon the plain language of the contract and Nour's affidavit. From that respect, this case is not as simple as ACN suggests.

ACN is in the business of selling jewelry, precious gemstones, and related items through various venues, including television broadcasts. Marksteiner holds the broadcast license for television station WHDT in Stuart, Florida. Marksteiner is the President and CEO of MIG, which operates station WHDT in the West Palm Beach television market.

It is undisputed that in late March 2004, MIG and ACN entered into an Affiliate Airtime Agreement (the "2004 Agreement"), which is at the heart of this dispute. Pursuant to the 2004 Agreement, ACN specifically agreed to make a minimum monthly payment of $51,000 (the "Base Payment") to MIG in exchange for MIG providing it with airtime. ACN made these monthly Base Payments to MIG in advance for the upcoming month; after the end of each month, ACN would pay a further commission to MIG in arrears in the amount of 16% of ACN's net sales in excess of $280,000, which were attributable to WHDT (the "Adjusted Payment").

The initial term of the 2004 Agreement was from April 1, 2004, through March 31, 2005. The primary provision of the 2004 Agreement at issue in this litigation is the following: "This Agreement will renew automatically for one-year terms unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term." [*See* Doc. 1-2, p.1].[2] Also at issue in this litigation is the notice provision of the 2004 Agreement which provides as follows:

> Any notices contemplated by this Agreement shall be in writing, sent by certified mail and return receipt requested, hand delivery, or other delivery service that provides written delivery verification and shall be deemed received the earlier of either two business days after mailing or when actually confirmed by written verification.

[*Id.*, p.4].

---

[2] The 2004 Agreement is attached as Ex. A to the original complaint only; however, the original complaint was later amended on March 19, 2007, to add Marksteiner as a defendant [*see* Doc. 22], but the 2004 Agreement was not attached to that pleading.

In support of its motion, ACN points out that Marksteiner did not provide notice of termination of the 2004 Agreement in writing within thirty days prior to March 31, 2006, the termination date of the first renewal term.  Rather, on March 9, 2006, Marksteiner sent an e-mail to Andy Caldwell, Jewelry Television's Vice President of Distribution, stating in part as follows:

> the [sic] annual contract with MIG for airtime in the West Palm Beach, Florida market is due to expire this month.  The relationship has proved to be profitable for both parties over the past four years.  At this time MIG desires that any new renewal contract be simplified to operate on a commission-only basis.

[*See* Doc. 34-5, p.19].  Because the notice was sent less than thirty days before the scheduled termination date, ACN contends this notice was untimely.  ACN also takes the position that this notice was not proper because it was sent via e-mail as opposed to one of the means specified in the notice provision of the 2004 Agreement.  Nevertheless, this e-mail was referred to Jewelry Television's Senior Vice President of Affiliate Relations, Harris Bagley,[3] who responded on March 14, 2006, as follows:

> When I passed on your March 9, 2006 email to our attorney to discuss changes in the agreement, he pointed out that the agreement has already extended for an additional one year term and is non-cancelable.  Regardless, without waiving the contract I am available to discuss possible changes with you ... .

[*See* Doc. 25-2, p.24].

---

[3]As will become apparent, there are two Bagleys employed by ACN, Burt and Harris.  Harris Bagley is Burt's father.  Consequently, the Court will refer to each by first and last names.

4

Thereafter, ACN made the monthly Base Payments to MIG for April, May, June, and July 2006.  ACN also paid the Adjusted Payments for March, April, and May 2006 to MIG.  Furthermore, during this same period, ACN and MIG discussed possible changes to their contractual relationship.

On June 30, 2006, Marksteiner sent a letter to Harris Bagley stating that, "[i]n March of this year I timely notified you that the annual contract then in effect between JTV and MIG would expire on 31 March 06 and that MIG would not renew carriage of JTV programming under the terms of this agreement." [*Id.*, p.26].[4]  Marksteiner explained in his deposition that the "timely" notification to which he was referring was his March 9, 2006 e-mail [*see id.*, p.13].[5]  Moreover, in his June 30th letter, Marksteiner stated that the Jewelry Television feed would be terminated on July 1, 2006 [*see* Doc. 25-2, p.26].

It is undisputed that MIG terminated the Jewelry Television feed on July 1, 2006.  According to Nour, ACN has been damaged in three ways, all of which directly result from MIG's breach of contract at that point in time.  First, MIG received a Base Payment from ACN of $51,000 for July 2006;  however, MIG did not carry the Jewelry Television feed in that month [*see* Doc. 26, p.2].  Consequently, ACN did not make an Adjusted Payment to MIG in arrears for June 2006 sales [*see id.*].  When the $51,000 overpayment of the Base

---

[4]On July 3, 2006, Marksteiner also e-mailed to Harris Bagley a copy of that June 30th letter because he was concerned that Harris had not received "previous communication."  [*Id.*, p.25].

[5]All page references to Marksteiner's deposition or any other deposition will be to the docket entry page number - not the actual deposition page number.

Payment is netted against the Adjusted Payment for June sales that was not paid, ACN contends that it is owed $21,703.95 [*id.*].

Second, ACN contends that it has lost, and is losing, profits from the sale of goods it would have made to viewers of WHDT if MIG had not breached the contract [*see id.*, p.3]. According to Nour, these lost profits total $1,388,424.56 for the period from July 1, 2006, through March 31, 2007 [*id.*].

Finally, ACN contends that it makes a profit on the revenue it receives for shipping goods [*id.*, p.4]. Because of MIG's breach of contract, ACN maintains that it has lost, and is losing, profits it would have made from shipping goods it would have sold in the West Palm Beach area [*id.*]. According to Nour, these lost profits total $190,233.97 for the period from July 1, 2006, through March 31, 2007 [*id.*]. Therefore, Nour has calculated ACN's total damages at $1,600,362.37 [*id.*].

## B. Defendants' Position.

In response to ACN's virtually undisputed facts and Mr. Nour's affidavit, MIG offers the following proof to demonstrate that there are several genuine issues of material fact, based in large measure on these parties' previous dealings, as to whether the 2004 Agreement had automatically renewed on April 1, 2006. And because the 2004 Agreement had not renewed, MIG contends that it was not in breach of that agreement and therefore has no liability to ACN. MIG does point out, however, that the parties orally agreed to do business on a month-to-month basis after March 31, 2006, and that MIG has honored those

commitments. In order to address fully the legal issues raised by ACN's motion, a rather detailed recapitulation of the history of the parties' entire relationship is necessary.

i. The 2002 Agreement.

The parties entered into their first Affiliate Airtime Agreement on September 1, 2002 (the "2002 Agreement"), through a broker called Backchannel Media, whereby MIG would carry the Jewelry Television program. [*See* Doc. 34-4, pp.22-27]. The 2002 Agreement provided that MIG would send ACN an affidavit of performance by the 15th of each month, basically stating the times during the previous month when Jewelry Television was aired on WHDT (the "Billing Affidavit") [*id.*, p.24]. ACN would calculate its net sales, deducting for returned items, and then pay MIG a rate of "$0.76 per subscriber per year, or otherwise, fifteen percent (15%) of the net sales ... whichever amount is greater." [*Id.*, p.23].

The 2002 Agreement was to run for one year [*id.*]. Under the cancellation provision, either party could terminate the 2002 Agreement upon thirty days prior written notice to the other [*id.*]. Attached to the 2002 Agreement after the signature page was a section entitled "Additional Terms and Provisions," with one key provision pertaining to notice: "Any notices contemplated by this Agreement shall be writing, sent by certified mail, return receipt requested, and shall be deemed received two business days after mailing." [*Id.*, p.27]. Thus, if either party wanted to terminate the 2002 Agreement before the one year term ended on August 31, 2003, it could do so by sending a written notice by certified mail.

ii.  The 2003 Agreement.

Before the 2002 Agreement ended, however, the parties entered into a new agreement dated March 31, 2003 (the "2003 Agreement") [Doc. 46-2, pp.1-6].  Although the start date for the 2002 Agreement was April 1, 2003, it is interesting to note that this agreement was not actually signed by all the parties until April 24, 2005, several weeks later [*id.*, p.4].  Significantly, the parties have produced no correspondence concerning the 2003 Agreement.  Rather, according to the testimony of two of ACN's employees, Burt Bagley and Patsy Harris, the parties primarily corresponded by phone and e-mail [*see* Doc. 34-2, p.36;  Doc. 34-4, p.9].

The 2003 Agreement generally provided for the same payment structure as the 2002 Agreement, *i.e.*, MIG sent a Billing Affidavit, and ACN paid based on net sales, deducting for returned items [*see* Doc. 46-2, p.2].  The primary negotiated differences were a rate increase and the time of payment - the commission was to be paid every month, five days in advance [*id.*].  As before, the term of the 2003 Agreement was one year [*id.*, p.1].

One critical change in the 2003 Agreement from the 2002 Agreement was that the parties substituted a renewal provision in lieu of the cancellation provision, as follows:

> **Renewal**.    This Agreement will renew automatically for additional one-year terms unless either party terminates the Agreement in writing or at least thirty (30) days prior to the end of any term.

[*Id.,* p.2].  Thus, the deadline for providing notice of termination of the 2003 Agreement was March 1, 2004.

Also attached to the 2003 Agreement were the same Additional Terms and Provisions attached to the 2002 Agreement. Notably, the same boilerplate notice language was employed: "Any notices contemplated by this Agreement shall be in writing, sent by certified mail, return receipt requested, and shall be deemed received two business days after mailing." [*Id.*, p.6]. A notice of termination under the 2003 Agreement was therefore precisely like a notice of termination under the 2002 Agreement and was to be provided in writing by certified mail.

### iii. Events Preceding 2004 Agreement.

On March 9, 2004, Marksteiner sent the following e-mail to Harris Bagley and copied Andy Caldwell[6]:

> Please be advised that WHDT-DT 59 Stuart has contracted airtime to ACN until 1 April 2004. Due to the large block of airtime involved, it is not feasible for WHDT to offer a comparable block of airtime past the 15th of this month. I have previously submitted carefully constructed plans for both an identical and an extended version of airtime for ACN to continue on WHDT in the [West Palm Beach designated marketing area].

[Doc. 34-4, p.35]. Marksteiner also explained that the cost of airtime for Jewelry Television had increased by 16%, and that WHDT needed to sell off airtime then contracted to Jewelry

---

[6]As previously noted, Caldwell was Jewelry Television's Vice President of Distribution. MIG describes Caldwell's role as "the contract manager for the MIG relationship." [Doc. 32, p.6]. While the record is unclear as to whether this was some sort of official designation, Caldwell testified that he was "the one that [sic] communicated all deal points between MIG and Jewelry Television, or ACN." [Doc. 34-4, p.28].

Television if Jewelry Television did not agree to an increased rate payment to MIG [*id.*].

The e-mail indicates that it was sent at 5:40 p.m. [*id.*].

At 6:51 that same evening, Caldwell responded to Marksteiner by e-mail, stating that

Jewelry Television is:

> ... unable to pay the increased rate you are requesting ... . We are working through our contacts with the cable system to obtain the accurate basic cable subscriber counts. We hope to have by Friday or at the latest on the following Monday.
>
> . . .
>
> However, with all of this being said, we still would like to stay on the station and come to an agreement that is fair and acceptable for both parties. ...

[*Id.*, p.37].

On March 12, 2004, Caldwell sent to Marksteiner a second e-mail with a counter-offer

from Jewelry Television [*id.*, p.39]. The e-mail clearly indicates that the parties had

discussed the proposed deal that morning [*id.*].

On March 16, 2004, Caldwell sent another e-mail to Marksteiner, indicating that he

had spoken with Jewelry Televisions's in-house attorney about "the new terms of the

Agreement." [*Id.*, p.42]. In that e-mail, Caldwell also maintained that "[t]hey have agreed

to all the terms of the new deal, but would like for the commission to be calculated and paid

on a quarterly basis." [*Id.*]. Caldwell further stated that:

> ... our in-house attorney will be out of town the rest of the week. Therefore, I will not be able to send the Agreement until next Monday afternoon. I know you were hoping to get this sooner. However, I can assure you that if we can agree on this last issue, we will have Verbal Agreement.

[*Id.*].

Approximately two hours later that same day, Marksteiner responded by e-mail that MIG had already made certain concessions and that "that's enough concessions for me." [*Id.*]. Marksteiner then added:

> As far as where your in-house attorney will be is not my concern. This contract has been on the radar screen for some time and everyone knows the required dates. If you want to continue for [sic] without a contract and/or until your attorney has time to draft one, then be sure to send WHDT its first check for $51K this week. It was due upon signing, which was supposed to be yesterday, the 15th of March (at the latest). If for some reason we cannot come to terms with the commission by next Monday, I will return your money.

[*Id.*].

On March 18, 2004, Caldwell again e-mailed Marksteiner, stating: "With further discussions, everyone has agreed to move forward with the original terms .... As I mentioned, our attorney is out of town until Monday. We do have a verbal agreement. We will send over a contract on Monday afternoon." [Doc. 34-5, p.2].

On March 25, 2004, Caldwell e-mailed a revised agreement (the "2004 Agreement") for Marksteiner's signature, asking him to return by fax [*id.*, p.4]. Caldwell has testified that the 2004 Agreement was Jewelry Television's "standard agreement" and was drafted by Jewelry Television [*see* Doc. 34-3, p.29]. The 2004 Agreement reflects that it was executed on March 25, 2004, by Charles A. Wagner, III, on behalf of Jewelry Television and on March 27, 2004, by Marksteiner on behalf of MIG [*see* Doc. 1-2, p.4].

iv.  The 2004 Agreement.

The 2004 Agreement, which is at the heart of this litigation, provided that ACN would pay MIG a Base Payment of $51,000 in advance on or before the 25th of each month and, if sales exceeded $280,000, an Adjusted Payment equal to 16% of the Adjusted Gross Sales (gross sales less cancellations, returns, taxes, and shipping) [*id.*, p.1].  The Adjusted Payment was to be made by the 25th day of the following month [*id.*].

The term of the 2004 Agreement was one year, effective April 1, 2004, through March 31, 2005 [*id.*].  Like its predecessors, the 2004 Agreement required MIG to send ACN a Billing Affidavit by the 15th of each month [*id.*].  Like the 2003 Agreement, the 2004 Agreement provided that it would automatically renew for one year terms unless either party terminated in writing at least 30 days prior to the end of any term [*id.*].  Also like its predecessors, the 2004 Agreement contained Additional Terms and Provisions which were attached at the end, including the boilerplate notice provision requiring notice by certified mail [*id.*, p.4].  It must be emphasized that the new Notice provision contained additional language:

> Any notices contemplated by this Agreement shall be in writing, sent by certified mail, return receipt requested, hand delivery, *or other delivery service that provides written delivery verification* and shall be deemed received the earlier of either two business days after mailing or when actually confirmed by written verification.

[*Id.* (emphasis added)].

v. The 2005 Renewal.

In early 2005, as the renewal date of March 31st approached, MIG raised certain issues with ACN regarding the 2004 Agreement. Because Caldwell was responsible for monitoring that contract [*see* Doc. 34-3, pp.30-31], Marksteiner directed his concerns to Caldwell. According to Marksteiner, the parties engaged in a significant number of telephone discussions and e-mail exchanges about the renewal [*see* Doc. 34-2, p.4].

Caldwell testified, however, that he does not recall any discussions with MIG [*see* Doc. 34-3, p.38]. Nevertheless, consistent with Marksteiner's testimony, Caldwell admitted that he was responsible for answering any questions from MIG as to whether proper payments were being made under the 2004 Agreement [*id.*].

According to Marksteiner, one of the renewal issues raised concerned internet sales to residents in the West Palm Beach area. More specifically, MIG was becoming increasingly alarmed that those residents watching Jewelry Television on WHDT were then placing their orders with Jewelry Television using their home computers because it was more efficient than using the telephone [*see* Doc. 34-2, p.37]. Obviously, such sales were excluded from MIG's commission under the 2004 Agreement [*id.*, p.38]. As Marksteiner put it, the concept of internet sales was "a new thing" which was not "contemplated" by the 2004 Agreement [*id.*]. According to Marksteiner, however, Caldwell assured that these internet sales were negligible.[7] Additionally, MIG raised the issue of having to wait for payment

---

[7]In support of this statement, MIG relies on Marksteiner's deposition testimony at page 19 [*see* Doc. 32, p.9]; however, that page was apparently omitted from Marksteiner's deposition tendered to the Court [*see* Doc. 34-2, pp.1-45].

until after returns were processed and deducted [*see id.*, pp.2-3]. Nevertheless, according to Marksteiner, after various exchanges with ACN, MIG "elected to allow [the 2004 Agreement] to continue with some verbal understanding of how we deal with ambiguities and issues. These were not significant factors at the time ... . They became more significant come 2006." [*Id.*, pp.4-5].

vi. The Events of 2006.

On January 24, 2006, Patsy Harris, the Affiliate Contracts Manager for Jewelry Television, sent an e-mail to MIG asking when preemption credits would be paid [*see* Doc. 34-5, p.8]. According to Marksteiner, Harris was MIG's "primary contact at Jewelry Television" and, by her own admission, was in charge of administering the 2004 Agreement [*see* Doc. 34-2, p.9; Doc. 34-4, p.6]. As part of the routine business between these parties, MIG provided Harris with a Billing Affidavit which set forth all of the time slots where Jewelry Television was preempted by other programing. [*See* Doc. 34-4, p.11]. In response to Harris's e-mail about preemption credits, Marksteiner called her to explain that because MIG was paid on commission, Jewelry Television was not actually paying for airtime so that it would not be entitled to any preemption credits [*see* Doc. 34-2, pp.13-14]. Harris remembered the telephone conversation about preemption but no details [*see* Doc. 34-4, pp.9,13].

Following their telephone conversation, Marksteiner sent Harris an e-mail dated January 25, 2006, with a detailed explanation of the parties' arrangement and why Jewelry Television was not entitled to preemption credits, specifically stating as follows:

> WHDT is not liable for paying airtime credits to ACN when ACN net sales exceed the $280K threshold set by the airtime contract. When net sales exceed $280K, WHDT is compensated only by a straight sales commission which is computed as a percentage of net sales above this threshold. ACN does not pay WHDT for this airtime.

> The effect of any [Jewelry Television] preemption by WHDT after the $280K net sales level is reached comes entirely off the commission paid to WHDT so that WHDT bears 100% of the cost of any preempted airtime. The $51K in guaranteed airtime purchased by ACN is not impacted until the net sales fall below the guarantee [sic] threshold.

> In the event that ACN's sales fall below $280K, a portion of the fixed $51K fee paid to WHDT for guaranteed airtime must be credited back to ACN in the event that any [Jewelry Television] airtime is preempted by WHDT. The credit is computed according to specific rates for the affected daypart as reflected in the guaranteed airtime portion of the contract. This mechanism is mute [sic] because net sales attributed to WHDT well exceed the $280K threshold in practice.

[Doc. 34-5, p.10]. Harris remembered receiving that e-mail [*see* Doc. 34-4, p.12].

According to Marksteiner, this conversation with Harris brought home the point that even the person who was in charge of administering the agreement did not really understand it [*see* Doc. 34-2, pp.14-16]. Consequently, on January 30, 2006, Marksteiner sent another e-mail to Harris which stated in pertinent part as follows:

> The ACN-WHDT agreement is poorly drafted and did not explicitly contemplate the high sales level which WHDT consistently brings in.

> . . .

15

The ACN contract with WHDT is due to expire very shortly. In the past, the old contract has just been allowed to automatically renew even though it contained ambiguous holdover language. Since the preemption issue has not come up before, no one cared about it. Since it is being raised now, any renewal contract will have to contain new and appropriate language.

The person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT. ...

[*See* Doc. 34-5, pp.13-14].

On January 31, 2006, Harris responded by e-mail stating, among other things, that Burt Bagley would contact Marksteiner regarding the contract [*see id.*, p.16]. Harris further explained in her deposition that Burt would be taking over that territory because Caldwell was transitioning out of that position [*see* Doc. 34-4, pp.2 and 17-18]. Moreover, Harris testified that she either forwarded the January 30th e-mail to Harris Bagley and Burt Bagley or discussed the e-mail with them or both [*id.*, pp.14-15].

For whatever reason, Burt Bagley did not contact Marksteiner [*see* Doc. 34-2, pp.48-49]. Consistent with Harris's testimony, Burt Bagley indicated that at that time he was "taking over the territory of the eastern region with also the broadcast ... ." [*Id.*, p.50]. With respect to the MIG contract, Burt Bagley testified that "Harris [Bagley] and Andy [Caldwell] were working on that deal." [*Id.*, p.48]. Moreover, Burt Bagley "had discussed with Harris [Bagley] that he was taking the lead on this ... ." [*Id.*, p.49].

Harris Bagley testified that he received Marksteiner's e-mails dated January 25 and January 30, 2006 [Doc. 34-3, p.5]. He also testified that he does not recall having any

conversation with Burt about MIG contractual issues [*id.*, p.6]. In the meantime, as indicated by Harris, Caldwell did, in fact, move into the Marketing Department [Doc. 34-3, p.27].

On February 3, 2006, Marksteiner wrote an internal e-mail stating, "SO FAR <u>NO WORK</u> [sic] <u>FROM BAGLEY ABOUT THE WHDT CONTRACT</u>." [Doc. 34-5, p.18]. Furthermore, at some point in January or February 2006, Marksteiner told Caldwell that MIG would have no choice but to terminate the Jewelry Television programming on WHDT on April 1st if the parties did not have a new contract [Doc. 34-2, pp.10, 18]. According to Marksteiner, Caldwell told him not to send a letter of termination because it would make negotiations impossible and ACN would have nothing to do with WHDT; moreover, because WHDT was probably the "most profitable station" that ACN had, ACN did not want to lose it [*id.*, pp.18-19, 23-24]. Finally, Marksteiner testified that Caldwell informed him that they would have a "new contract in place ... as soon as possible," and that if it was after March 31st, it would be made retroactive to April 1st [*id.*, pp.19-20].

Another topic which transpired during this same time frame was, according to Marksteiner, the issue of Comcast Cable [*id.*, p.27]. In particular, Caldwell informed Marksteiner that, under ACN's national contract with Comcast Cable, if Comcast gained access to a cable tv channel, then Comcast would have the discretion to carry Jewelry Television in the West Palm Beach area [*id.*, p.28]. At that time, Adelphia was a company that was in bankruptcy and its assets were being sold [*id.*, p.6]. Comcast was attempting to buy Adelphia's cable tv assets, including cable channels in the West Palm Beach market [*id.*]. Caldwell indicated to Marksteiner that ACN would not be able to secure a full-time

cable channel for Jewelry Television on any Comcast cable system which served the West Palm Beach area if WHDT continued to broadcast Jewelry Television [*id.*, pp.6-7]. Harris also confirmed in her deposition that if ACN had obtained full-time carriage with Comcast, ACN would have reduced the hours with MIG to avoid duplication of the feed [Doc. 34-4, pp.19-20]. Consequently, Harris Bagley testified that he told Marksteiner that the parties might want a shorter agreement - less than one year - should Comcast decide to carry Jewelry Television [*see* Doc. 34-3, p.17; *see also* Doc. 34-2, pp.27-28].

At some point during these various discussions, Caldwell, according to Marksteiner, told Marksteiner that Caldwell was no longer handling affiliate contracts [*id.*, p.7]. Furthermore, according to Marksteiner, Caldwell related that this file was too complex for him to take notes and that Marksteiner should set forth the details in an e-mail which could be forwarded to Harris Bagley.[8]

On March 9, 2006, Marksteiner sent Caldwell an e-mail outlining the issues discussed with Caldwell and explaining the new terms MIG was seeking [*see* Doc. 34-5, pp.20-21]. According to Marksteiner, this e-mail was sent "to stop the automatic renewal." [Doc. 34-2, p.39]. The e-mail stated in part as follows:

> [T]he annual contract with MIG for airtime in the West Palm Beach, Florida market is due to expire this month. ... At this time MIG desires that any new renewal contract be simplified to operate on a commission-only basis.

---

[8]According to MIG's brief, this statement is supported by the testimony of Marksteiner at page 20 of his deposition [*see* Doc. 32, p.13]. The Court's review of that testimony, however, does not support that statement. Nevertheless, it is undisputed that Marksteiner sent an e-mail to Caldwell on March 9, 2006 [*see* Doc. 34-5, pp.20-21], which was obviously precipitated by some sort of discussion between these two individuals.

. . .

> ...  The complex terms and procedures contained in the [2004] affiliation agreement have become burdensome and need to be replaced by a completely redrafted agreement based on a straight sales commission computed from [Jewelry Television] net sales.

> . . .

> MIG must increase its nominal airtime rates by 15%.

> . . .

> ...  Language correcting [the internet sales issue] and other matters related to WHDT's over-the-air broadcast of [Jewelry Television] ... must be addressed in any new affiliation agreement.

> Given the relative simplicity of the proposed business arrangement, I suspect that your attorney can prepare a satisfactory airtime agreement which addresses the aforementioned matters.  ...

[*Id.*].  Within thirty minutes or so of receiving that e-mail, Caldwell forwarded it to Harris Bagley and Burt Bagley, noting that it was of "[h]igh" importance [*see* Doc. 34-5, p.23].

On March 10, 2006, Harris Bagley responded by e-mail to Caldwell to run a sales report for the last four months [*see* Doc. 34-5, p.27].  Additionally, on that same date, Caldwell e-mailed Marksteiner, indicating that Harris Bagley would contact him [*see id.*, p.30].

After that, Caldwell testified that he had no further involvement with Marksteiner, but believed that Harris Bagley and Marksteiner may have spoken [*see* Doc. 34-3, p.35].  Harris Bagley testified that he "pulled the contract" to review it [*id.*, p.11].

According to Marksteiner, during the month of March 2006, the parties exchanged various e-mails with drafts of new contracts and revisions, as well as comments about those drafts [*see* Doc. 34-2, p.29]. On March 14th, Marksteiner and Harris Bagley had a conversation regarding the agreement. First, prior to the meeting, Harris Bagley sent an e-mail to Marksteiner indicating that Jewelry Television had made a 20% increase in total payments to WHDT comparing April 2004 through December 2004 with April 2005 through December 2005 [*see* Doc. 34-6, p.23]. That evening, Marksteiner sent a modification to the 2004 Agreement to Harris Bagley based on "our discussion today ... ." [*See id.*, p.2-21]. On March 23rd, Marksteiner e-mailed Harris Bagley another draft of the agreement [*see id.*, p.23; *see also* Doc. 34-3, pp.17-18].

After that, Harris Bagley did not remember responding to Marksteiner about this draft or engaging in any other discussions [*see id.*, pp.19-20]. He did remember, however, that Marksteiner was growing "increasing impatient" with his unresponsiveness [*id.*, p.20]. Nevertheless, Harris Bagley testified that he was "extremely busy with a lot of other agreements ... ." [*Id.*]. In particular, he was spending a lot of time in April and May with the Shop-at-Home acquisition [*id.*, pp.7-8]. Again, Harris Bagley's job was to review all of the affiliation agreements with respect to the acquisition [*id.*, p.7]. Consequently, Marksteiner accepted Caldwell's explanation that the Shop-at-Home deal was consuming all of Harris Bagley's time - along with ACN's attorneys - so that they were unable to respond more quickly to his contractual concerns [*see* Doc. 34-2, pp.8, 21].

Given the parties' history and recent communications, Marksteiner was comfortable that the termination date of the 2004 Agreement was not important to ACN [*id.*, p.21]. Additionally, while Marksteiner understood that ACN's attorney took the position that the 2004 Agreement had already been renewed, Marksteiner understood through subsequent conversations that ACN's position had changed [*see id.*, pp.25-27]. According to Marksteiner, the parties orally agreed that they would continue to do business on a month-to-month basis, and that there were at least two conditions: (1) the new agreement would be made retroactive to April 1st; and (2) MIG would no longer have to provide Billing Affidavits to ACN because such affidavits were time-consuming and unnecessary given the fact that the Jewelry Television programming was broadcast at fixed times [*see id.*, pp.39-42]. Harris Bagley, too, recalled discussions with Marksteiner at this time, specifically remembering that Marksteiner had questions about the internet, the number of subscribers, zip codes, and other issues regarding payment [*see* Doc. 34-3, p.14].

After his discussion with Harris Bagley, Marksteiner understood that the parties had a verbal agreement or a "gentleman's agreement" as follows:

> It meant let things alone, we will work out the contract details in the upcoming weeks. Whether it passes by a certain date or not I wasn't going to turn them off. Whether it passes by the same date he is not going to exercise any kind of weird rights about termination and roll-over. ... It did not mean we are going to keep it on the air and keep getting paid happily our [$]51,000 plus 16 percent in the future for the same contract and the same contract problems.

[Doc. 34-2, p.24]. Marksteiner also made it clear that if ACN had taken the position in January or February 2006 that the 2004 Agreement would be automatically renewed as

written unless formally terminated by March 1st, or if ACN had maintained this position after the March 13th e-mail and subsequent discussion with Harris Bagley, MIG would have terminated the Jewelry Television programming at that time [*id.*, pp.22, 30-31, and 43].

In the meantime, MIG continued to provide airtime, and ACN continued to make payments calculated under the 2004 Agreement. MIG did not, however, send Billing Affidavits in accordance with the parties' verbal agreement; instead, MIG sent pro forma "invoice[s]" [*see* Doc. 34-6, p.36]. ACN did not object to this change in practice [Doc. 34-2, pp.40-42]. On May 17, 2006, Marksteiner e-mailed Harris Bagley indicating "that it is time for some movement on the new contract." [Doc. 34-6, p.38]. In response, Harris Bagley e-mailed Marksteiner stating, "I am trying ... I promise ... Harris." [*Id.*]. Regarding this e-mail exchange, Harris Bagley testified that while he did make changes to the first draft to the 2004 Agreement, he does not remember sending Marksteiner any comments on the last draft, stating in particular, "Honestly, priority wise, that just was not at the top of the priority at that point." [Doc. 34-3, p.22].

On May 19, 2006, Marksteiner e-mailed Harris Bagley indicating that the matter was "URGENT." [Doc. 34-6, p.44]. In that e-mail, Marksteiner attached the Jewelry Television sales report for April, showing that the return rate had reached 50%, which was "intolerable." [*Id.*]. It must be kept in mind that the average rate of return for Jewelry Television, according to Harris Bagley, was 30% to 33% [*see* Doc. 34-3, p.3]. Marksteiner requested that Harris Bagley make every effort to contact him "at your soonest [sic] convenience." [Doc. 34-6, p.44].

According to Marksteiner, the high return rate raised two sets of concerns: (1) MIG's commission was directly tied to the return rate; and (2) WHDT's reputation was directly tied to the quality of jewelry sold on Jewelry Television [Doc. 34-2, pp.30-34]. Both Harris Bagley and Caldwell admitted that if the return rate was 50%, this would mean that Jewelry Television was not performing as it should [*see* Doc. 34-3, pp.4, 36-37].

In response to MIG's inquiries about the high return rate, ACN indicated that it was the result of its generous return policy and also that some customers, for example, would purchase two high-end items - one gold and the other silver - and then return one [*see* Doc. 34-2, p.34]. However, Marksteiner did his own investigation by watching Jewelry Television and also had MIG's master control review the programming, all of which indicated that what they saw was not consistent with ACN's explanation [*id.*, pp.34-35]. Harris also discussed the return rate with Marksteiner during this time frame [*see* Doc. 34-4, p.10].

Sometime in June 2006, Marksteiner left a voicemail with Harris Bagley expressing his concerns about operating without a contract. While Harris Bagley testified that he does not recall this, he did admit it could have happened [*see* Doc. 34-3, p.23].

On June 30, 2006, Marksteiner sent Harris Bagley an e-mail reiterating the terms of the parties' month-to-month agreement and further stating in part as follows:

. . .

... As you know, there has been no progress on this matter even though I have delivered several new contracts to [Jewelry Television] and made several inquiries. At one point I believe that you suggested that [Jewelry Television] was able to effect renewal of its previous airtime contract with MIG through unilateral action on its part, a matter which I dispute.

> MIG cannot indefinitely continue to carry [Jewelry Television] programming below prevailing rates and as of 1 July 2006, MIG shall terminate the [Jewelry Television] feed on television station[] WHDT ... .

[*See* Doc. 34-6, p.47].  Later that day, Marksteiner, as FCC licensee for WHDT, instructed MIG to terminate Jewelry Television effective July 1, 2006.  ACN then filed this lawsuit on July 6, 2006 [*see* Doc. 1].

## II. *Summary Judgment Standards*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist.  *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but  must come forward with some significant probative evidence to support its claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  *Id.* at 323.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question; but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

III.   ***Choice of Law Determination***

When a federal court's jurisdiction is based solely on diversity of citizenship, the federal court must apply state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under the *Erie* doctrine, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941); *Tele-Save Merchandising Co. v. Consumers Distributing Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987). Under Tennessee law, the validity of a contract and the substantive rights of the parties thereto are governed by the laws of the state contemplated by the parties. *See Mackey*

*v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989) (citing *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977)).

In this case, the 2004 Agreement contains a forum selection clause[9] which states that the "Terms of this Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, and the sole venue of any action arising out of or related to this agreement is in a court of record in Knox County, Tennessee." [Doc. 1-2, p.3]. It is well settled in Tennessee that the rights and obligations under a contract are governed by the law of the state with the view to which it was made and that the intentions of the parties, gathered from the terms of the instrument and all attending circumstances, control. *See, e.g., Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). Therefore, based upon the clear language of the 2004 Agreement, and there being no reason demonstrated to set that provision aside, the Court finds that the terms of the 2004 Agreement are controlled by the laws of the State of Tennessee.

IV.  ***Breach of Contract***

Under Tennessee law, the rights and obligations of contracting parties are governed by their written instruments. *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). The cardinal rule in the construction of contracts is to ascertain the intent

---

[9]Often referred to as "forum selection clauses," these standard provisions, as in the instant case, not only speak to where the lawsuit must be filed but also, and more importantly for present purposes, speak to which state's law will control the interpretation of the agreement.

of the parties. *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999) (citing *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310 (Tenn. Ct. App. 1984)). Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and *by the construction placed on the agreement by the parties in carrying out its terms*." *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990) (emphasis added).

When the agreement is unambiguous, the meaning is a question of law, and the court must enforce the agreement according to its plain terms. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975). The courts are also not "at liberty to relieve parties from their contractual obligations simply because these obligations later proved to be burdensome or unwise." *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47 (citations omitted). Moreover, the courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made. *Bradson Mercantile*, 1 S.W.3d at 652 (citing *McKee v. Continental Ins. Co.*, 191 Tenn. 413, 234 S.W.2d 830 (1951)). Finally, whether contractual terms are ambiguous is also a question of law for the court. *Tennessee Consol. Coal Co. v. United Mine Wkrs. of Am.*, 416 F.2d 1192, 1198 (6th Cir. 1969), *cert. denied*, 397 U.S. 964 (1970). The language of a contract is ambiguous if its

meaning is susceptible to more than one reasonable interpretation. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

Additionally, in Tennessee, "[a]fter a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1991). This is true even if the agreement expressly specifies that the parties may only modify the agreement in writing, such as in the instant case.[10] *Co-operative Stores Co. v. United States Fid. & Guar. Co.*, 137 Tenn. 609, 195 S.W. 177, 180 (1917). "The parol evidence rule is inapplicable to evidence of oral modification because the rule will 'permit testimony to ... show a subsequent modification to a written agreement. Once admitted, this evidence does not in any way deny what the original agreement expressed; however, it merely demonstrates that the parties may have exercised their right to modify the written agreement.'" *Shah v. Racetrac Petroleum* Co., 338 F.3d 557, 573 (6th

---

[10]The 2004 Agreement states, "This Agreement constitutes the entire Agreement between the parties hereto, and may not be modified or amended in any manner other than by supplemental *written* agreement executed by the parties to be affected thereby." [*See* Doc. 1-2, p.4 (emphasis added)].

Cir. 2003)[11] (quoting *Golden Constr. Co. v. Greene*, No. 83-286, 1987 WL 18061, at *1 (Tenn. Ct. App. Oct. 9, 1987) (unpublished)).

## V.   *Analysis*

Against this background of Tennessee law, the Court first concludes as a matter of law that the language of the 2004 Agreement is anything but ambiguous with respect to renewal. *See Tennessee Consol. Coal Co.*, 416 F.2d at 1198 (whether contractual terms are ambiguous is a question of law for the court). The pellucid language of the 2004 Agreement states that it "will renew automatically for one-year terms unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term." [Doc. 1-2, p.1]. It is undisputed that the original 2004 Agreement went from April 1, 2004, through March 31, 2005, and that the parties allowed it to automatically renew from April 1, 2005, through March 31, 2006. Moreover, if the only written notice ever received by ACN was Marksteiner's e-mail sent on March 9, 2006, then that notice was sent well within the 30-day

---

[11]This case is somewhat reminiscent of the *Shah* case. There, defendant raised a thirty-day termination clause in support of its motion for summary judgment, arguing that the clear language of the clause allowed either party to terminate the contract upon "thirty (30) days written notice ... ." *Id.* at 562. The late trial judge originally assigned to this case, the Honorable James H. Jarvis, agreed with the defendant that the contract meant what it said and said what it meant, similar to plaintiff's argument in this case, and granted defendant's motion [*see* Doc. 66 in 3:99-cv-410]. Nevertheless, the Sixth Circuit reversed, finding genuine issues of material facts to support several theories as to how plaintiff could prevail despite the seemingly clear language of that contract. *Id.* at 577. At trial, conducted by the undersigned, the jury agreed with plaintiffs and awarded them over $50,000 in damages [*see* Doc. 173 in 3:99-cv-410], which was ultimately increased by the Court to more than $300,000 pursuant to the various theories upon which plaintiff prevailed [*see* Doc. 202 in 3:99-cv-410].

deadline established by the 2004 Agreement, thereby supporting ACN's argument that the contract was automatically renewed for a second term from April 1, 2006, through March 31, 2007.

Nevertheless, the Court concludes, based on the present record, that MIG has raised several genuine issues of material fact as to whether the 2004 Agreement was still viable after March 31, 2006 (except as orally modified).  In fact, MIG's proof is close to leading the Court to the conclusion, even at this point in time, that it was not.  Most notably, MIG provided ACN clear notice of its desire to negotiate significant changes prior to the renewal notice deadline of March 1, 2006, when Marksteiner e-mailed Harris Bagley on January 30, 2006, beginning with the statement that the 2004 "[A]greement is poorly drafted and did not explicitly contemplate the high sales level which WHDT consistently brings in." [Doc. 34-5, p.13].  Marksteiner further indicated in that e-mail that the "contract with WHDT is due to expire very shortly";  that "any renewal contract will have to contain new and appropriate language," primarily in reference to preemption;  and that the "person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT." [*Id.*, p.14].  All of this language would, in the Court's view, put a reasonable person on notice that the 2004 Agreement would have to be renegotiated to be viable.  Certainly implicit in that notion is the concept that the 2004 Agreement would be terminated unless "new and appropriate language" was added.  Given the parties' prior practices concerning less than timely negotiations of previous agreements, the Court is of the opinion that this January 30th e-mail creates a genuine issue of material fact as to whether MIG provided sufficient notice

to prevent automatic renewal, even though that e-mail did not use the words "cancel" or "terminate." *See Oakland Press Co. v. N.L.R.B.*, 606 F.2d 689, 691 (6th Cir. 1979). When the March 9th e-mail is placed in context with the January 30th e-mail, and viewing the facts most favorable to the non-moving party, the March 9th e-mail may be nothing more than a follow-up to a timely January 30th notice.[12]

Furthermore, in contrast to the parties' prior practices, MIG has introduced evidence that ACN, instead of responding to Marksteiner's January 30th request, delayed or stalled for a variety reasons - reassignments of key ACN personnel, other job-related distractions by key ACN personnel, and just waiting to determine whether Comcast would carry Jewelry Television in the West Palm Beach area in 2006. MIG has also introduced evidence which, if believed, would support a finding that Caldwell pleaded with Marksteiner not to send a letter of termination but, consistent with their previous dealings, to work with a ACN on a new contract, even past the deadline. So, according to Marksteiner's testimony, the parties had a "gentleman's agreement." [Doc. 34-2, p.24]. Additionally, MIG has introduced proof to support its position that it had a multitude of legitimate business reasons for requiring a new contract whereas ACN did not. Again viewing the proof in the light most favorable to MIG and drawing all reasonable inferences in favor of MIG, one could conclude that ACN

---

[12]MIG also contends that Marksteiner's January 25th e-mail was some sort of notice. While the January 25th e-mail sheds considerable light on the January 30th e-mail, the Court does not discern much language to prevent automatic termination in that earlier e-mail, unlike the January 30th e-mail.

lacked the incentive to respond quickly because ACN was well-served by the 2004 Agreement such as to further support MIG's position, at least at this stage of the proceedings.

ACN also has a second reason for arguing that its motion for partial summary judgment is well founded. ACN maintains that any e-mail notice by MIG is not proper because it is not the type of notice specified in the 2004 Agreement. MIG has, however, raised a genuine issue of material fact with respect to this issue because of the construction placed on previous agreements by the parties in carrying out those very same terms. *See Penske Truck Leasing Co.*, 795 S.W.2d at 671. For example, under the parties' first agreement, the 2002 Agreement, notice of termination was also to be sent by certified mail [*see* Doc. 34-4, p.27]. Yet, before the term of that 2002 Agreement ended, the parties entered into the 2003 Agreement effective April 1, 2003, and the parties did so informally, through e-mail and telephone exchanges.

MIG also points to negotiations surrounding the 2003 Agreement in support of its position regarding notice by e-mail. The 2003 Agreement had a termination date of March 31, 2004, and provided for automatic renewal for one-year terms unless either party sent notice of termination thirty days prior to the end of the term [*see* Doc. 46-2, p.1]. Again, any notice was to be in writing and sent by certified mail [*see id.*, p.6]. Nevertheless, on March 9, 2004, MIG e-mailed ACN that the contract ended on April 1, 2004, and that it was not feasible to continue pursuant to the same terms [*see* Doc. 34-4, p.35]. Thereafter, the parties exchanged comments and drafts of new agreements through e-mail and eventually entered into a new agreement, all without objection by ACN [*see id.*, pp.37-44; Doc. 34-5, pp.2-4].

Finally, with respect to the propriety of sending an e-mail notice as opposed to certified mail or hand delivery, the notice provision language in the 2004 Agreement itself requires only that notice be in writing;  that written notice can be sent by "other delivery service that provides written delivery verification ... ."  [Doc. 1-2, p.4].  Here, MIG has raised an additional genuine issue of material fact that e-mail notice is sufficient under the 2004 Agreement because Marksteiner's January 30th e-mail was responded to the very next day by Harris in her e-mail [*see* Doc. 34-5, p.16].  This response by Harris would may very well comprise "delivery verification" under the 2004 Agreement.

## V.  *Conclusion*

For the reasons foregoing, it is hereby ORDERED that ACN's motion for partial summary judgment [Doc. 25] be, and the same hereby is, DENIED in its entirety.[13]

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[13]It also appears that MIG has raised a genuine issue of material fact as to whether the 2004 Agreement was orally modified by the parties to allow negotiations to continue inside the third-day deadline.  *See Galbreath*, 811 S.W.2d at 91.  This issue, however, may need further development at trial.