UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

AMERICA'S COLLECTIBLES )
NETWORK, INC., )
)
　　　　Plaintiff, )
)
v. )　　No.:　3:06-cv-260
)　　　　(VARLAN/SHIRLEY)
MIG BROADCAST GROUP, INC., )
and GUENTER MARKSTEINER, )
)
　　　　Defendants. )

## MEMORANDUM OPINION

In this diversity action, plaintiff America's Collectibles Network, Inc., d/b/a Jewelry Television ("ACN" or "Jewelry Television"), seeks compensatory damages against defendant MIG Broadcast Group, Inc. ("MIG"), for breach of a written contract [*see* Doc. 22]. ACN also seeks treble damages against defendant Guenter Marksteiner ("Marksteiner") for his role in interfering with that contract and for procuring that breach of contract [*see id.*]. Finally, ACN seeks prejudgment interest, costs, and attorney fees against both defendants [*see id.*]. In their answers, defendants contend that they have no liability whatsoever to ACN [*see* Docs. 29 and 30].[1]

---

[1]MIG also filed a second amended counterclaim with its answer to the amended complaint, alleging that ACN is in breach of the parties' written agreement as well as an oral contract and further that ACN has made fraudulent and negligent misrepresentations which have resulted in damage to MIG [*see* Doc. 29, pp.6-11]. However, the Court dismissed with prejudice this counterclaim based upon MIG's failure to oppose the motion made by ACN pursuant to Fed. R. Civ. P. 50 at the close of proof on September 12, 2007 [*see* Doc. 64]. Consequently, MIG's counterclaim was terminated that day and merits no further discussion in this memorandum opinion.

This matter came before the Court on September 11 and 12, 2007, for a bench trial [*see* Docs. 63-64]. After giving careful consideration to the testimony of the witnesses, the exhibits introduced at trial, the transcripts of the proceedings [*see* Docs. 66-67], the proposed findings of fact and conclusions of law, as amended [*see* Docs. 51, 54, 70, and 71], the post-trial briefs [*see* Docs. 72, 74, 79, and 80], and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).[2]

### *Findings of Fact*

1.     ACN, a Tennessee corporation, is headquartered in Knox County, Tennessee, and is in the business of selling jewelry, precious gemstones, and related items through various venues, including television programming [*see* Doc. 66 at 6].[3] ACN produces its television programming in Knoxville, Tennessee [*see id.*]. Harris Bagley,[4] an executive with ACN, is responsible for distribution of ACN's programming through broadcast, cable, or direct-to-home affiliates [*see id.*].

2.     Marksteiner, a resident of New Hampshire, holds the broadcast license for television station WHDT in Stuart, Florida [*see id.* at 174]. Marksteiner is the President and CEO of MIG, a New Hampshire corporation, which operates WHDT in the West Palm Beach

---

[2]Even though the trial of this case was concluded on September 12, this case was not ripe for adjudication until December 10, when the final brief was filed by ACN [*see* Doc. 80].

[3]Doc. 66 references the transcript of the first day of trial, and Doc. 67 will reference the transcript of the second day of trial.

[4]As will become apparent, ACN employs two Bagleys, Burt and Harris. Harris Bagley is Burt's father. Consequently, the Court will usually refer to each by first and last names but will, on occasion, refer to them by first names only, depending on the surrounding text.

television market [*see id.* at 175; *see also* Doc. 67 at 42]. MIG maintains a 24-hour broadcast schedule [*see* Doc. 66 at 176].

3. WHDT was the first high definition television station ("HDTV") station in the United States [*see id.* at 175]. As a pioneer, WHDT fought for "must-carry" status on cable television [*see id.* at 177-78]. Consequently, cable companies must now carry WHDT along with other broadcast stations that customers typically lose when they "hook[] up" to cable [*see id.* at 190].

4. According to Harris Bagley, ACN contracts with affiliates nationwide for airtime for Jewelry Television [*see id.* at 17]. Typically, ACN pays affiliates based on the amount of time Jewelry Television is aired [*see id.*]. ACN enjoys a gross profit of about forty-five to fifty percent on the goods it sells [*see id.* at 42].

5. Sometime around early 2002, ACN wanted access to cable television in West Palm Beach [*see id.* at 9]. Through a broker, ACN contacted WHDT [*see id.* at 178]. At the time, ACN was, according to Marksteiner, "an emerging small company" [*see id.* at 180]. MIG agreed to air ACN's shopping service on WHDT as an "experiment." [*See id.* at 185-86].

6. As a result of those successful negotiations, the parties began doing business under a basic broker agreement dated August 21, 2002 (the "2002 Agreement") [*see id.* at 180; *see also* Jt. Tr. Ex. 16]. The 2002 Agreement provided for a one-year term [*see* Jt. Tr. Ex. 16 at 2].

7.     Under the 2002 Agreement, ACN agreed to compensate MIG based on the number of cable subscribers WHDT reached, or based on fifteen percent of ACN's net sales attributed to WHDT, whichever amount was greater [*see id.*].  Under the "Cancellation" provision, the 2002 Agreement provided that both parties "have the right to terminate" at any time upon thirty days prior written notice sent by certified mail [*see id.*; *see also* Doc. 66 at 180].  Neither party sent a written notice of termination of the 2002 Agreement before its one-year termination date [*see* Doc. 66 at 181].  The 2002 Agreement was replaced during its term by a second agreement signed in April 2003 (the "2003 Agreement") [*see id.* at 45; *see also* Jt. Tr. Ex. 17].

8.     Although the 2003 Agreement was executed on April 24, 2003, it was made effective on April 1, 2003 [*see id.* at 181; *see also* Jt. Tr. Ex. 17 at 1].  During the three-week delay, MIG continued to air Jewelry Television [*see* Doc. 66 at 181].

9.     The 2003 Agreement provided for larger blocks of time on WHDT – 17 hours per day during the week and 15 hours per day on the weekends [*see* Doc. 66 at 82; *see also* Jt. Tr. Ex. 17 at 1].  Like the 2002 Agreement, ACN again agreed to compensate MIG based on the number of WHDT cable subscribers, or fifteen percent of net sales, whichever was greater [*see* Jt. Tr. Ex. 17 at 2].  Under the "Terms" provision, the 2003 Agreement was "non-cancelable by either party."  [*See id.* at 1].  Under the "Renewal" provision, the 2003 Agreement provided that the initial one-year term would automatically renew "unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term."  [*See id.* at 2; *see also* Doc. 66 at 183].  Thus, by its own terms, the 2003 Agreement

ended March 31, 2004; however, the deadline for providing notice of termination by certified mail was March 1, 2004 [*see* Jt. Tr. Ex. 17]. Nevertheless, as of March 1, 2004, neither party had sent notice of termination by certified mail [*see* Doc. 66 at 184].

10. On March 9, 2004, Marksteiner e-mailed ACN regarding deal points which MIG wanted to address in a new contract [*see id.* at 48; *see also* Jt. Tr. Ex. 19]. Marksteiner addressed the e-mail to Harris Bagley, who oversaw affiliate contracts [*see* Jt. Tr. Ex. 19]. Marksteiner also copied Andy Caldwell ("Caldwell"), who managed affiliate contracts for ACN and therefore had responsibility for negotiating the MIG agreement [*see id.*; *see also* Doc. 66 at 160]. At that time, Caldwell was aware of the previous agreements between the parties [*see* Doc. 66 at 160].

11. In his March 9th e-mail, Marksteiner stated that "[d]ue to the large block of airtime involved, it is not feasible for WHDT to offer a comparable block of airtime past the 15th of this month." [Jt. Tr. Ex. 19]. Marksteiner further stated in that e-mail that "it appears that much of this time can be readily sold at prices appreciably higher than what is being offered [by] ACN ... . The cost of airtime on WHDT has increased by 16% ... ." [*Id.*].

12. Caldwell remembered seeing this e-mail [*see* Doc. 66 at 161]. A little more than an hour after receiving it, Caldwell responded to Marksteiner that ACN did not agree to all proposed terms but "would like to stay on the station and come to an agreement that is fair and acceptable for both parties." [*See id.* at 163; *see also* Jt. Tr. Ex. 20]. Caldwell copied Harris Bagley with that letter [Jt. Tr. Ex. 20].

13. On March 12th, Caldwell sent Marksteiner a second e-mail with a counter offer from Jewelry Television [Jt. Tr. Ex. 21]. The e-mail indicated that the parties had discussed the proposed deal that morning [*id.*].

14. On March 16th, Caldwell sent another e-mail to Marksteiner, stating that he had spoken with Jewelry Television's in-house attorney about "the new terms of the agreement." [Jt. Tr. Ex. 22]. In that e-mail, Caldwell maintained that "[t]hey have agreed to all the terms of the new deal but would like for the commission to be calculated and paid on a quarterly basis." [*Id.*]. Caldwell further stated that:

> ... Our in-house attorney will be out the rest of the week. Therefore, I will not be able to send the Agreement until next Monday afternoon. I know you were hoping to get this sooner. However, I can assure you that if we can agree on this last issue, we will have a Verbal Agreement.

[*Id.*]. Caldwell testified that the parties were "actually in negotiations here and talking about points." [*See* Doc. 66 at 164].

15. Later that morning, Marksteiner responded that he had made enough concessions and that "this contract has been on the radar screen for some time and everyone knows the required dates." [Jt. Tr. Ex. 23]. Marksteiner also pointed out that the contract was supposed to be signed on the 15th and that the first check for the agreed to higher monthly payment of $51,000 was then due [*id.*].

16. On March 18th, Caldwell e-mailed Marksteiner that "everyone has agreed to move forward with the original terms ... . We do have a verbal agreement. We will send over a contract on Monday afternoon." [Jt. Tr. Ex. 24]. Caldwell testified that the parties

in fact had a verbal agreement that was later memorialized in writing and became the agreement at issue in this case [*see* Doc. 66 at 165-66].

17.     Marksteiner testified that he handled the Jewelry Television negotiations personally because of the sensitive nature of providing a live feed and the potential liability associated with that [*see id.* at 189].  Furthermore, Marksteiner was of the opinion that because he was the licensee, he was "a hundred percent accountable to the FCC for all Jewelry Television programming," pointing out that the FCC was constantly changing its interpretations about matters [*see id.*].

18.     On March 25, 2004, Caldwell e-mailed a revised Affiliate Airtime Agreement (the "2004 Agreement") for Marksteiner's signature, asking him to return it by fax [Jt. Tr. Ex. 25].  Caldwell testified that the 2004 Agreement was ACN's "standard agreement" and was drafted by ACN [*see* Doc. 34-3 at 29].  Caldwell further testified that the 2004 Agreement was simply modified to reflect the sales base payment structure [*see* Doc. 66 at 167].  The 2004 Agreement was executed on March 25, 2004, by Charles A. Wagner, III, on behalf of ACN, and on March 27, 2004, by Marksteiner on behalf of MIG [*see* Jt. Tr. Ex. 1 at 4].

19.     The 2004 Agreement, which lies at the very heart of this litigation, provided that ACN would pay MIG a Base Payment of $51,000 in advance on or before the 25th of each month and, if sales exceeded $280,000, an Adjusted Payment equal to sixteen percent of the Adjusted Gross Sales (gross sales less cancellations, returns, taxes and shipping) [Jt.

Tr. Ex. 1 at 1]. The Adjusted Payment was to be made by the 25th of the following month [*id.*].

20. The term of the 2004 Agreement was one year, effective April 1, 2004, through March 31, 2005 [*id.*]. Like its predecessors, the 2004 Agreement required MIG to send ACN a Billing Affidavit by the 15th of each month [*id.*]. Like the 2003 Agreement, the 2004 Agreement provided that it would "renew automatically for one-year terms unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term." [*Id.*]. Also, like the 2003 Agreement, the 2004 Agreement was "non-cancelable by either party." [*Id.*].

21. The notice provision of the 2004 Agreement, however, was somewhat modified from previous contracts, stating as follows:

> Any notices contemplated by this Agreement shall be in writing, sent by certified mail, return receipt requested, hand delivery, *or other delivery service that provides written delivery verification* and shall be deemed received the earlier of either two business days after mailing or when actually confirmed by written verification.

[*Id.* at 4 (emphasis added)]. Harris Bagley agreed that this notice provision added another way for sending notice [*see* Doc. 66 at 47]. Marksteiner also testified that MIG had "asked that the notice method be expanded to allow for e-mail, electronic notices, since we are doing nothing but faxes and telephone calls, anyways." [*Id.* at 194]. Although Marksteiner agreed with the statement that the notice provision of the 2004 Agreement was "specifically negotiated" [*see* Doc. 67 at 52], Marksteiner conceded that the notice provision of the 2004

Agreement as executed makes no reference to permitting notice by fax, telephone, or e-mail [*see id.* at 53].

22.     Under the 2004 Agreement, MIG agreed to carry Jewelry Television's feed from 12:00 a.m. to 5:00 p.m. (17 hours a day), Monday through Friday, and then for 24 hours a day on Saturday and Sunday [*see* Jt. Tr. Ex. 1, p.1].  Nevertheless, at trial, Marksteiner testified that if he determined that he wished to run alternative programming during these hours, he could "make the determination that that's reasonably necessary and take Jewelry Television's feed off the air and put on whatever [he] want[s]."  [*See* Doc. 67 at 50].  Marksteiner further testified that he could make that determination in his "sole, individual discretion."  [*Id.*].  However, with reference to preemptions, the 2004 Agreement specified otherwise:

> [MIG] shall have the right to preempt ACN's programming whenever such preemption is reasonably necessary to fulfill obligations of [MIG] under the Communications Act of 1934, as amended, and other applicable law and regulations.  Except as herein specified, [MIG] agrees that ACN programming will not be preempted.  [MIG] agrees to provide ACN with prompt written notice of any preemption and any maintenance or cable system failures which prevent ACN programming from being aired as specified in this Agreement. ACN shall not be responsible for payment for airtime during any time that its programming is not being aired on the Station or the Cable, and ACN's credit shall be at the rates as specified in attached Exhibit C.

[Jt. Tr. Ex. 1 at 3].[5]  Exhibit C of the Agreement provided as follows:

---

[5]The above language of the 2004 Agreement clearly does not support Marksteiner's claim on this issue.  There is, however, language in a proposed new agreement which he sent to ACN on March 23, 2006, which arguably supports his position [*see* Jt. Tr. Ex. 36 at 000066].  Nevertheless, that language was not employed in the final version of the 2004 Agreement.

Based upon 627,700 subscribers, credits for preemption or for any failure of [MIG] or the cable to air ACN programming shall be as follows:

| | |
|---|---|
| 12a-6a | $ 52.32 per hour |
| 6a-12 noon | $ 88.10 per hour |
| 12noon-6p | $103.82 per hour |
| 6p-12mid | $112.49 per hour |

These credit rates will adjust on a monthly basis based upon a pro rata adjustment for increases or decreases in subscriber count.

[*Id.* at 9].

23.     In early 2005, despite some percolating issues, MIG did not find it necessary to negotiate a new contract, and Marksteiner therefore did not notify ACN that MIG would not renew the 2004 Agreement [*see* Doc. 67 at 5].  Because ACN did not receive notice of termination from MIG more than thirty days prior to March 31, 2005, by any of the mechanisms identified in the 2004 Agreement, ACN considered that the 2004 Agreement had automatically renewed under the renewal provision for a first renewal term from April 1, 2005, through March 31, 2006 [*see id.* at 15-16].

24.     One of the key percolating issues, at least from MIG's perspective, was the requirement that MIG report the number of cable subscribers each month [*see* Doc. 66 at 190].  This provision of the 2004 Agreement required extensive work because ACN would not accept the number of subscribers provided by the cable companies, considering  that number "inflate[d]."  [*See id.* at 190-91].  Consequently, to ensure the accuracy of the number of subscribers, MIG was compelled to send employees to each individual town to examine appropriate city records [*see id.* at 191-92].

25.     Furthermore, pursuant to the 2004 Agreement, net sales typically remained at a level of $500,000 to $600,000, well above the $280,000 minimum [*see* Doc. 67 at 6].  In MIG's view, therefore, the number of cable subscribers became irrelevant and, after discussions with ACN, MIG quit providing such figures for purposes of the Billing Affidavits [*see id.* at 6-7].

26.     In early January 2006, Patsy Harris,[6] the Affiliate Contracts Manager and Director of Distribution for ACN, noticed that there were gaps in sales attributable to WHDT during certain periods of time and e-mailed WHDT's Manager, Brian Content ("Content"), asking when preemption credits would be given by MIG to ACN [*see* Doc. 66 at 83 and 85-86;  *see also* Jt. Tr. Ex. 26].  Ms. Harris's concern was that Jewelry Television's signal was not airing on WHDT during the times specified in the 2004 Agreement [*see* Doc. 66 at 85].

27.     Ms. Harris's e-mail was brought to Marksteiner's attention [*see* Doc. 67 at 8].  Instead of having Content respond to that e-mail, Marksteiner personally called Ms. Harris [*see id.* at 9].  Marksteiner explained that MIG did not give preemption credits under the 2004 Agreement because this was not a typical affiliate airtime contract with payment based on time;  rather, the only period of time in which credits had been given was when ACN's net sales had dropped below the $280,000 floor [*see id.* at 10].  Marksteiner testified that the only time ACN was entitled to preemption credits was when WHDT was "off the air during hurricanes for several weeks with no electricity and where sales went virtually to nothing

---

[6]To avoid confusion between Patsy Harris and Harris Bagley (whom the Court will sometimes refer to as Harris), the Court will refer to Patsy Harris as "Ms. Harris."

... ." [*Id.* at 8].  In Marksteiner's view, ACN was due that credit because the $51,000 Base Payment advanced MIG was not earned during the time in question [*see id.*].

28.  Ms. Harris remembered talking with Marksteiner about preemption credits during this late January time frame; however, she could not remember any specific dates [*see* Doc. 66 at 93-94].  Furthermore, telephone records do not reflect this conversation, but the parties agree that this conversation occurred [*see id.* at 125].

29.  Following their telephone conversation, Marksteiner sent Ms. Harris an e-mail dated January 25, 2006, with a detailed explanation of the parties' arrangement and why Jewelry Television was not, in his view, entitled to preemption credits [*see* Jt. Tr. Ex. 27]. More specifically, Marksteiner explained that as long as net sales are above the $280,000 floor, MIG is paid on a straight commission [*see id.*].  Therefore, if MIG preempts Jewelry Television's airtime, MIG reduces its own commission [*see id.*].  Moreover, if the net sales fall below $280,000, MIG will provide preemption credits according to the 2004 Agreement's specific mechanism [*see id.*].

30.  Ms. Harris recalled receiving the January 25th e-mail in response to her inquiries about preemption [*see* Doc. 66 at 92].  Ms. Harris admits understanding what Marksteiner was saying, but she did not agree with him because "the contract stated how to deal with preemptions."  [*See id.* at 92-93].

31.  The January 25th e-mail also addressed the fact that MIG had not been compensated for sales generated in certain zip codes [*see* Jt. Tr. Ex. 27].  Ms. Harris responded to Marksteiner by e-mail dated January 26 that she would "check on the zips."

[*See id.*; *see also* Doc. 66 at 94]. Ms. Harris does not remember sending any additional e-mail, and none was located during discovery [*see* Doc. 66 at 96-97].

32.    On January 30th, Marksteiner sent another e-mail to Ms. Harris [*see* Jt. Tr. Ex. 28]. The e-mail began: "The ACN-WHDT agreement is poorly drafted and did not explicitly contemplate the high sales levels which WHDT consistently brings in." [*Id.* at 1]. The e-mail explained how the $51,000 Base Payment "guarantee" is "worthless" because net sales always exceed the threshold [*id.* at 2]. The e-mail continued:

> The ACN contract with WHDT is due to expire very shortly. In the past, the old contract has just been allowed to automatically renew even though it contained ambiguous holdover language. Since the preemption issue has not come up before, no one cared about it. Since it is being raised now, any renewal contract will have to contain new and appropriate language. The person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT.

[*Id.*].

33.    At trial, Marksteiner testified as follows regarding the January 30th e-mail:

> But, nevertheless, this issue of preemption matters started to become, in January ... , more than a minor issue. Therefore, I thought it was a good opportunity to deal with this and a number of other issues that were also non-trivial at the point, at the end of 2005, and provide clear, I believed to be clear, notice that we were not going to renew the contract; that we had to deal with this preemption issue, the fact that it was clearly not understood.

[*See* Doc. 67 at 12]. But, at the same time, Marksteiner did not consider his e-mail to be a notice of termination given that throughout the parties' history, whether the term "terminate" or "cancel" was used, neither party could unilaterally end an agreement before it expired [*see id.* at 65-66].

34.     Because the January 30th e-mail was sent at 8:12 p.m., Ms. Harris testified that she would not have seen it until January 31st [*see* Doc. 66 at 96].  Ms. Harris also "knew that she had upset [Marksteiner] with [her] questioning about preemption ... ."  [*Id.* at 101].  Consequently, she told both Harris Bagley and Burt Bagley that she "believe[d that she] upset [Marksteiner] and he has asked that someone call him."  [*Id.*].

35.     Ms. Harris understood that the January 30th e-mail referred to preemption issues and to a number of contractual issues that were beyond her areas of responsibility [*see id.* at 97].  Moreover, Ms. Harris understood that the contract issues needed to be addressed by someone other than herself [*see id.* at 97 and 99].  Significantly, Ms. Harris did not understand this e-mail from Marksteiner to be a termination of the 2004 Agreement [*id.* at 86].  Moreover, neither Marksteiner nor Content ever informed her that the 2004 Agreement had been terminated [*see id.* at 89].  Ms. Harris did testify, however, that had she received a notice of termination by certified mail or by hand-delivery, or by a service providing for written delivery verification such as FedEx, she would have immediately provided a copy to Harris Bagley [*id.* at 123].

36.     Following his discussion with Ms. Harris, Harris Bagley informed her that it was not worth pursuing ACN's concerns over preemption because ACN enjoyed its relationship with MIG [*see id.* at 19].  Harris Bagley also testified that he was unable to locate a copy of the January 30th e-mail on his computer and therefore concluded that it had not been forwarded to him [*id.* at 40-41].  Harris Bagley also pointed out that because he was above the level of vice-president, his e-mails are retained indefinitely [*id.* at 81].  Thus, if the

14

January 30th e-mail had been forwarded to him, it would have been retained on his computer indefinitely because that was ACN's practice for his level of management [*id.*]. At trial, Harris Bagley testified that he could not recall actually seeing the January 30th e-mail at the time [*see id.* at 53]. However, in his deposition, Harris Bagley testified that he was "sure" that Ms. Harris had forwarded that January 30th e-mail to him [*see* Doc. 34-3, p.5].[7] Similarly, Ms. Harris testified in her deposition that she may have forwarded the January 30th e-mail to Harris and Burt Bagley or simply discussed the e-mail with them or perhaps she did both [*see* Doc. 34-4, pp.14-15].

37.    After discussing the issue of preemptions raised by the January 30th e-mail with Harris Bagley, Ms. Harris sent Marksteiner an e-mail on January 31st as follows:

> Forget it.  All I asked was that someone explains [sic] why additional preemptions had occurred that had not occurred before.  I didn't get an answer so I suggested a credit.  That gets people's attention wherever you go.  Burt Bagley will contact you regarding the contract.  To the best of my knowledge both parties have had little to complain about in regards to the contract.

[Jt. Tr. Ex. 29].  Ms. Harris explained in her deposition that Burt Bagley would be taking over that territory because Caldwell was transitioning out of that position [*see* Doc. 34-4, pp. 2 and 17-18].

38.    Burt Bagley testified that Ms. Harris did ask him to contact Marksteiner [*see* Doc. 66 at 128].  Burt then spoke with his father Harris, telling him that he thought it would be best if Harris handled that matter because Harris already knew Marksteiner [*id.*].  Harris

---

[7]All page references to depositions will be to the docket entry page number - not the actual page number.

agreed to do so [*see* Doc. 67 at 115]. However, Burt did not call or e-mail Marksteiner to inform him that Harris would now be contacting him rather than Burt [*see* Doc. 66 at 137]. As it turned out, Harris did not contact Marksteiner because Harris did not feel there was any urgency due to the fact that ACN did not wish to make an issue out of preemptions [*see* Docs. 115-116].

39.     The January 31st e-mail from ACN confirmed to Marksteiner that his January 30th e-mail had been delivered [*see* Doc. 67 at 15]. Moreover, from Marksteiner's viewpoint, the January 31st e-mail specifically stated that Burt Bagley would contact Marksteiner about the contract – not about preemption [*id.*]. In fact, Marksteiner believed that the reference to "Burt" was a nickname for Harris Bagley, having only dealt with Caldwell and Harris Bagley in the previous years [*see id.* at 16]. Marksteiner thus believed that Harris Bagley was in charge of affiliate contracts and would be contacting him about working on a new one [*see id.* at 15-16].

40.     On February 3rd, Marksteiner sent an internal e-mail to Roane Cross ("Cross"), his accountant and a director of MIG, stating that he had not heard from Harris Bagley [*see* Jt. Tr. Ex. 30]. At that time, Marksteiner was ready to work on a new contract [*see* Doc. 67 at 16]. Marksteiner e-mailed Cross because Cross was going to be involved in the negotiations with ACN [*see id.* at 17].

41.     It is undisputed that between January 30, 2006, and March 9, 2006, following Ms. Harris's e-mail to "[f]orget it," there were no written communications from MIG to ACN addressing any dissatisfaction with the 2004 Agreement or asking for any further discussions.

16

On March 9, 2006, less than thirty days before the scheduled expiration date of the first renewal term of the 2004 Agreement, Marksteiner sent Caldwell an e-mail outlining the changes which MIG was seeking, stating in pertinent part as follows:

> [T]he annual contract with MIG for airtime in the West Palm Beach, Florida market is due to expire this month. ... At this time, MIG desires that any renewal contract be simplified to operate on a commission-only basis.
>
> ... The complex terms and procedures contained in the Affiliation Agreement have become burdensome and need to be replaced by a completely redrafted agreement based on a straight sales commission computed from [Jewelry Television] net sales.
>
> . . .
>
> MIG must increase its nominal airtime rates by 15%.
>
> . . .
>
> ... Language correcting [the Internet sales issue] and other matters related to WHDT's over-the-air broadcast of [Jewelry Television] ... must be addressed in any new Affiliation Agreement.
>
> Given the relative simplicity of the proposed business arrangement, I suspect that your attorney can prepare a satisfactory airtime agreement which addressed the aforementioned matters. ...

[Jt. Tr. Ex. 2].

42. Caldwell testified that he was "shock[ed] to receive this e-mail "out of the blue[.]" [Doc. 66 at 168]. Caldwell testified that he had been transferred in the summer of 2005 out of the position from which he had previously dealt with Marksteiner into the position of Vice-President of Affiliate Marketing [*see id.* at 159 and 168]. Consequently, Caldwell had no communications with Marksteiner since the previous summer [*see* Doc. 67

at 113].[8] Marksteiner, however, testified that he had a lengthy phone call with Caldwell in January or February of 2006 [*see id.* at 58-60]. However, Marksteiner admitted that neither his nor MIG's telephone records reflected any such call with Caldwell [*see id.* at 59-60]. In a similar vein, Marksteiner testified that he made twenty to thirty unanswered calls to Harris Bagley [*see id.* at 61-62], which Bagley denied [*see id.* at 115-16]. However, there are no phone records to support this assertion by Marksteiner [*see id.* at 59], and based upon the testimony and demeanor of the witnesses and the record as a whole, the Court would resolve this factual issue in plaintiff's favor.

43. Marksteiner testified that he sent this e-mail to "repeat to as many people at ACN as I can, in as formal and direct a way as I can, that I don't want to dump them, but I do need a new contract." [Doc. 67 at 18]. As the March 9th e-mail states, the 2004 Agreement was going to expire, and he wanted "to move forward with ... a new contract." [*Id.* at 18-19].

44. Approximately thirty minutes after receiving the March 9th e-mail, Caldwell forwarded it to both Harris and Burt Bagley, noting that it was of "[h]igh importance [*see* Jt. Tr. Ex. 31]. The following morning, March 10th, was the first time when Harris Bagley learned of the March 9th e-mail from MIG [*see* Doc. 66 at 24]. Prior to that time, Harris had undertaken no discussions with Marksteiner or anyone else about terminating the 2004

---

[8]More specifically, Caldwell testified that he had no conversations with Marksteiner since the summer of 2005 until June 30, 2006, a date well after the point in time of the events under current discussion [*see id.*].

Agreement with MIG [*see id.* at 30]. Harris did not consider, however, that the March 9th e-mail effected a termination of the agreement [*see id.* at 50]. It must be emphasized that the March 9th e-mail makes no reference to the telephone calls that Marksteiner claimed to have had with Caldwell in January or February of 2006; it makes no reference to the twenty to thirty unanswered phone calls which Marksteiner claimed that he made to Harris Bagley; it makes no reference to the January 30th e-mail to Ms. Harris; and it makes no reference to any conversations with Ms. Harris [*see id.*; *see also* Doc. 67 at 75] further bolstering a finding on this and other factual issues in plaintiff's favor and against Marksteiner.

45. On March 10th, the first day on which Harris Bagley became aware of Marksteiner's March 9th e-mail, Harris forwarded Marksteiner's e-mail to Caldwell and Burt Bagley and copied Ms. Harris, stating as follows:

> Please have Debra run an annual review of this deal with net sales, returns, payments to affiliate, %, and anything else that is relevant. [Marksteiner] is looking at the last four months ... . This is going to be contentious and is more complex with Direc-tv's stance on this deal.

[Jt. Tr. Ex. 32]. Harris Bagley then e-mailed Ms. Harris shortly afterwards to "add monthly and annual costs per FTE." [Jt. Tr. Ex. 31]. Harris Bagley testified that he was gathering information "to evaluate the benefit of this working arrangement with MIG[.]" [*See* Doc. 66 at 54]. With respect to his comments regarding Direc-TV's position on this issue, Harris Bagley testified that he was referencing the fact that in order to contract with Direc-TV, Direc-TV might have insisted that ACN reduce hours of airtime on WHDT [*see id.* at 55].

Also, on that same day, Caldwell e-mailed Marksteiner that he had forwarded his e-mail to Harris Bagley, and that Harris would contact him [Jt. Tr. Ex. 33].

46.     On March 13, 2006, Harris Bagley responded to Marksteiner's March 9th e-mail as follows:

> When I passed on your March 9, 2006 email to our attorney to discuss changes in the agreement, he pointed out that the agreement has already extended for an additional one year term and is non-cancelable. Regardless, without waiving the contract, I am available to discuss possible changes with you ... .

[Jt. Tr. Ex. 4]. In contrast to Marksteiner's position, Harris testified that, prior to his meeting with ACN's attorney, Charles Wagner, he had reviewed the 2004 Agreement and likewise determined that it had already "rolled over into the new year." [Doc. 66 at 25]. Furthermore, Harris testified that he never told Marksteiner that ACN's position was anything other than set forth in his March 13th e-mail [*see* Jt. Tr. Ex. 4]. Likewise, there was no documentary evidence introduced that ACN's position changed subsequent to the March 13th e-mail from Harris Bagley to Marksteiner.

47.     Shortly after the March 13th e-mail, Harris Bagley had a telephone conversation with Marksteiner [*see* Doc. 66 at 28]. The Court finds that, contrary to Marksteiner's statements in his response to ACN's first discovery request [*see* Jt. Tr. Ex. 44], Bagley did not tell Marksteiner "not to let the carriage of Jewelry Television be interrupted under any circumstances because ACN management would never agree to negotiate a new contract with MIG under such conditions." [*Id.*]. Nor did Harris Bagley tell Marksteiner that Jewelry Television's executives were heavily involved in an acquisition [*id.*]. Although

20

ACN did become involved with an acquisition of Shop-at-Home in May 2006, Harris Bagley was not even aware of such proposed acquisition in March 2006 [Doc. 66 at 28-29]. The Court further finds that Harris Bagley did not agree on "a month-to-month contract with MIG subject to an eventual retroactive rate adjustment effective as of April 1st." [*Id.* at 29]. Instead, Harris told Marksteiner that the 2004 Agreement had renewed, but ACN would discuss all issues with MIG without waiving its rights under the 2004 Agreement [*id.*].

48. Likewise, Caldwell had no discussions with Marksteiner or anybody else at MIG about any month-to-month contract with Jewelry Television [*id.* at 171]. Nor did Caldwell have any discussions with Marksteiner about any waiver by Jewelry Television of MIG's obligation to provide notice to terminate the 2004 Agreement [*id.*].

49. During the month of March 2006, the parties exchanged various e-mails with drafts of new contracts and revisions, as well as comments about those drafts [Jt. Tr. Ex. 34]. On March 14th, Marksteiner and Harris Bagley had a conversation regarding the Agreement [*id.*]. Prior to that conversation, Harris Bagley sent an e-mail to Marksteiner indicating that Jewelry Television had made a 20% increase in total payments to WHDT comparing April 2004 through December 2004 with April 2005 through December 2005 [*id.*]. That evening, Marksteiner e-mailed Harris Bagley that, "based on our discussion today, I have modified last year's Affiliation Agreement to reflect changes which I believe are appropriate." [*Id.*]. The e-mail indicated that changes include moving to a straight commission basis and eliminating unnecessary paperwork [*id.*]. The draft attached to the e-mail also indicated that

MIG has expanded preemption rights on a "best efforts" basis and did not provide for preemption credits [*id.*].

50.     On March 23rd, Marksteiner sent Harris Bagley another e-mail regarding deal points with an attached modified contract [Jt. Tr. Ex. 36; *see also* Doc. 67 at 26].  According to Marksteiner, he and Cross were "working aggressively" to have this contract finalized by March 31, 2006, so that the parties would not be operating without a contract [*see* Doc. 67 at 26-27].  However, as of March 31st, the parties did not have a finalized contract; nevertheless, MIG kept Jewelry Television on the air and ACN continued to make payments to MIG in accordance with the 2004 Agreement [*see* Doc. 66 at 60 and 62; *see also* Doc. 67 at 27].

51.     The Court specifically finds that MIG did not provide notice of termination of the 2004 Agreement in writing thirty days prior to March 31, 2006, the termination date of the first renewal term.  In fact, Marksteiner admitted at trial that, "I never terminated the Agreement." [Doc. 67 at 65].  Marksteiner claimed at trial that the 2004 Agreement was not terminable and was badly drafted, but he also admitted that he did not raise any such issue with ACN when he signed the 2004 Agreement for MIG [*see id.* at 66].  Marksteiner further claimed at trial that notice of termination equated with notice of non-renewal, asserting that he accomplished such a notice with his January 30th e-mail to Ms. Harris [*see id.* at 66-67; *see also* Jt. Tr. Ex. 28].  However, in view of a fully developed record and for reasons to be discussed further in the conclusions of law, the January 30th e-mail did not constitute proper notice terminating the 2004 Agreement.

52.     Marksteiner testified further that contract negotiations continued after March 31, 2006, and that the parties agreed to the following:  (1) MIG would keep Jewelry Television on the air while the new contract was being finalized;  (2) MIG no longer had to send Billing Affidavits;  and (3) ACN would continue to pay according to the terms of the 2004 Agreement but would adjust such payments retroactively based on the new terms [*see* Doc. 67 at 27-28].  Harris Bagley denied that he discussed or agreed to any of these deal points with MIG [*see* Doc. 66 at 29].  Again, based upon the testimony of the witnesses, their demeanor, and the record as a whole, the Court finds Harris Bagley's testimony more credible on this issue.

53.     With respect to airtime services for the months of January 2006 through July 2006, MIG submitted monthly invoices to Jewelry Television for the required $51,000 Base Payment for the service [*see* Jt. Tr. Ex. 45].  Each invoice bills Jewelry Television for the contractually required $51,000 Base Payment and each invoice specified that it was "[a]s per contract."[9]  While Marksteiner referred to the May, June and July invoices as "pro forma," [*see* Jt. Tr. Ex. 37 and Doc. 67 at 28], the invoices on their face appear to be regular in all respects.  It is undisputed that the invoices were paid in full by Jewelry Television.  Also, while Marksteiner testified that the form of the invoices changed after his March 9th e-mail to eliminate affidavits which had been required earlier [*see* Doc. 67 at 28-29], a review of the

---

[9]For whatever reason, the invoice for January 2006 did not repeat that language; nevertheless, that distinction has no significance with respect to the issues raised in this lawsuit.

invoices before and after the March 9th e-mail does not reflect the elimination of any affidavit.

54.     On May 9, 2006, Harris Bagley e-mailed Marksteiner that he had made changes to reflect his concerns and that it was being reviewed by ACN's attorney [*see* Jt. Tr. Ex. 38]. At this point in time, ACN was involved with three other matters that either consumed the time of its top executives or needed to be resolved before the MIG deal was finalized. As Harris Bagley testified, he "had a lot of accounts, yes, a lot of things in my court." [Doc. 67 at 122]. In his deposition, Harris testified: "Honestly, priority wise, [MIG] just was not at the top of the priority at that point." [Doc. 34-3, p.22].

55.     First, in April or May, Harris Bagley was engaged in ACN's acquisition of the Shop-at-Home Network [*see* Doc. 66 at 68-69]. His job was to evaluate the Affiliation Agreements with respect to the acquisition [*see id.* at 69].

56.     Second, there was some uncertainty as to whether Comcast Cable would be able to add Jewelry Television as a full-time channel to its West Palm Beach cable television system [*see id.* at 77]. ACN recognized that this development could pull sales from MIG [*see id.* at 78]. Moreover, ACN was concerned that under the 2004 Agreement, it still had to pay MIG the $51,000 even if it was not covered by ACN net sales [*see id.* at 78].

57.     Third, Harris Bagley admitted that ACN "really needed to resolve the DirecTV issue ... . It was very close, but it was not resolved." [*Id.* at 68]. Consequently, ACN was discussing whether it needed a shorter term agreement with MIG [*see id.* at 64]. The significance of this issue is that at the time of the negotiations, ACN had an issue with

DirecTV that, if unresolved, could have prevented it from broadcasting in its previous manner over WHDT.

58.     On May 17th, Marksteiner sent an e-mail to Harris Bagley that "it is time for some movement on the new contract." [Jt. Tr. Ex. 39]. In response, Harris e-mailed Marksteiner stating: "I am trying ... . I promise ... . Harris." [Jt. Tr. Ex. 40]. On May 19th, Marksteiner e-mailed Harris Bagley that the matter was "URGENT." [Jt. Tr. Ex. 41]. In that e-mail, Marksteiner attached the Jewelry Television sales report for April, showing that the return rate had reached 50%, which was "intolerable." [*Id.*]. According to Marksteiner, the high return rate raised two sets of concerns: (1) MIG's commission was directly tied to the return rate; and (2) WHDT's reputation was directly tied to the quality of jewelry sold on Jewelry Television [*see* Doc. 67 at 32].

59.     The last communication between MIG and Jewelry Television about possible changes in the 2004 Agreement, according to Harris Bagley, was his May 30, 2006 e-mail to Marksteiner [Jt. Tr. Ex. 41]. That e-mail stated: "I am in NY today but will be back at the end of the week ... . Let me know if you want to talk ... . Harris" [*id.*].

60.     However, Marksteiner claimed at trial that he received a "surprising" e-mail from Bagley in the latter part of June 2006 that ACN was "not going to negotiate any further." [*See* Doc. 67 at 34 and 41]. Nevertheless, that phantom e-mail was not produced in discovery, nor was it introduced at trial, despite the express request by ACN's counsel that it be produced [*see id.* at 40 and 57]. Harris Bagley denied making any such statement, either through an e-mail or in a conversation [*see id.* at 116-17]. Again, given the lack of

25

documentation supporting Marksteiner's testimony on this proof and the record as a whole, the Court finds that Harris Bagley's testimony is more credible on this issue.

61.     At 5:00 p.m. on Friday, June 30, 2006, after Jewelry Television had finished its last programming for the month, MIG ceased carriage of the Jewelry Television feed [*see* Doc. 67 at 51].  Harris Bagley learned of this development through Jewelry Television's Customer Service Department sometime over that weekend, *i.e.*, either July 1 or July 2 [*see* Doc. 66 at 11].

62.     On July 3rd, a Monday, following Harris Bagley's attempts to reach Marksteiner by telephone and by e-mail [*see id.* at 12-13], Marksteiner e-mailed Harris Bagley a copy of a letter from MIG dated June 30, 2006, which states that MIG is terminating the Jewelry Television feed as of July 1, 2006 [Jt. Tr. Ex. 5].  The June 30th letter further stated:  "In March of this year, I timely notified you that the annual contract then in effect between [Jewelry Television] and MIG would expire on 31 March 06 ... ." [*Id.*].  Interestingly, the July 3rd e-mail recited that Marksteiner had e-mailed and mailed the June 30th letter the previous week;  however, neither Bagley nor ACN received the letter until they received Marksteiner's July 3rd e-mail, the first notice to ACN from MIG that MIG had terminated Jewelry Television's feed [*see* Doc. 66 at 13].  Moreover, MIG produced no documentary evidence that the June 30th letter was sent by e-mail, regular mail, or certified mail prior to July 3, 2006.  The Court thus finds that it was not sent until July 3, 2006.

63.     Marksteiner admitted, and the Court so finds, that Marksteiner sent the June 30th letter in his individual capacity [*see* Doc. 67 at 87-89;  *see also* Jt. Tr. Ex. 49].

64.     After MIG ceased carriage of the Jewelry Television feed, Harris Bagley and Cross tried to renegotiate the contract [*see* Doc. 67 at 37 and 119].  However, ACN's counsel required first that the Jewelry Television feed be turned back on [*id.* at 119-20].  It is undisputed that those negotiations were unsuccessful.

65.     Marksteiner claimed that his action in terminating the feed was primarily due to the high level of returns of goods sold by Jewelry Television [*see* Doc. 67 at 89;  *see also* Jt. Tr. Ex. 49].  More specifically, Marksteiner testified that he considered the return rate for the Spring of 2006 to be "astonishing, ridiculous."  [*See* Doc. 67 at 32].  Ms. Harris testified at trial that the normal return rate is 35% [*see* Doc. 66 at 118].  And Ms. Harris admitted at trial that the returns in several months preceding the shut-off of the feed were a "little high" [*see id.* at 106], reaching 46% in March 2006 and 48% in April 2006 [*see id.* at 119;  *see also* Jt. Tr. Ex. 48].  However, Ms. Harris also testified that the increased returns in March and April 2006 were attributable in some measure to three or four customers who had ordered - and returned - a large amount of products [*see* Doc. 66 at 120].

66.     Ms. Harris also admitted that Marksteiner complained to ACN about the return rate;  however, the concern he expressed primarily related to how much commission MIG was losing [*see id.* at 121].  Marksteiner's concern with the loss of commission  –  as opposed to return rates  –  is reinforced by his internal e-mail to Cross dated June 7, 2006 [*see* Jt. Tr. Ex. 15].

67.     In considering Marksteiner's claim that he terminated the contract with ACN based on its high return rate and his further concern of liability as licensee, the Court notes that Marksteiner conceded that the draft agreements he submitted to ACN from March to May 2006 were silent with respect to return rates [*see* Doc. 67 at 89 and 103; *see also* Jt. Tr. Ex. 36]. Marksteiner conceded as well that he had never sent an e-mail to Harris Bagley about a need to address return rates [*see* Doc. 67 at 90]. Moreover, there is no language in the 2004 Agreement which addressed return rates [*see id.*]. Even more telling, the return rates for ACN in the West Palm Beach area were extremely high at various other times. For example, the rate was 61% in August 2003, 64% in September 2003, and 55% in September 2004 [*see* Doc. 66 at 118-20]. Yet, in spite of all of this, Marksteiner never made any mention of his purported obligation as licensee at these earlier points in time [*see* Doc. 67 at 100-101; *see also* Jt. Tr. Ex. 15]. In a similar vein, after the termination of the Jewelry Television feed, Harris Bagley testified that Cross never raised any issue about return rates or license problems with him during their negotiations [*see* Doc. 67 at 120]. In sum, the Court specifically finds that the record in this case belies Marksteiner's stated reason of high return rates for terminating the Jewelry Television feed.

68.     As a result of MIG's wrongful termination of the Jewelry Television feed on or before July 1, 2006, Jewelry Television suffered losses and will be compensated in the manner set forth in Ex. C to the 2004 Agreement beginning on July 1, 2006 [*see* Jt. Tr. Ex. 1, p.9]. In addition to that amount, Jewelry Television is entitled to $21,703.95, which is the July 2006 Base Payment netted against the Adjusted Payment for June 2006, which was not

made [*see* Jt. Tr. Ex. 6]. Moreover, ACN will be entitled to treble damages against Marksteiner for his role in procuring that breach of contract. Finally, ACN "shall be entitled to reasonable attorney's [sic] fees, travel expenses, and cost of Suit" as provided in the 2004 Agreement [*see* Jt. Tr. Ex. 1 at 3].

## *Conclusions of Law*

### **Choice of Law Determination - Contract Claim**

1. When a federal court's jurisdiction is based solely on diversity of citizenship,[10] the federal court must apply state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under the *Erie* doctrine, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). Under Tennessee law, the validity of a contract and the substantive rights of the parties thereto are governed by the laws of the state contemplated by the parties. *See Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989) (citing *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977)).

2. In this case, the 2004 Agreement contains a forum selection clause[11] which states that the "Terms of this Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, and the sole venue of any action arising out of or

---

[10]Jurisdiction is predicated on 28 U.S.C. § 1332(a)(1) and is not in dispute [*see* Doc. 56 at 1].

[11]Often referred to as "forum selection clauses," these standard provisions, as in the instant case, not only speak to where the lawsuit must be filed but also, and more importantly for present purposes, speak to which state's law will control the interpretation of the agreement.

related to this agreement is in a court of record in Knox County, Tennessee." [Jt. Tr. Ex. 1 at 3]. It is well settled in Tennessee that the rights and obligations under a contract are governed by the law of the state with the view to which it was made and that the intentions of the parties, gathered from the terms of the instrument and all attending circumstances, control. *See, e.g., Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). Therefore, based upon the clear language of the 2004 Agreement, and there being no reason demonstrated to set that provision aside, the Court finds that the terms of the 2004 Agreement are controlled by the laws of the State of Tennessee.

**Choice of Law Determination – Tort Claim**

3.        For tort claims, Tennessee follows the "most significant relationship" rule, which provides that "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). The injury to ACN, at least from a purely financial perspective, occurred in Tennessee where ACN is headquartered and where it produces its programming. ACN has briefed this issue in the context of Tennessee law.[12] Moreover, no party has alleged that another state, such as Florida, has a more significant relationship to this litigation. And finally, it could be argued with some degree of logic that the forum selection clause is applicable to a tort for procurement of breach of contract as "related to this

_____

[12]Defendants' briefs are silent on this issue.

agreement ... ." [*Id.*].  The Court, therefore, will apply Tennessee law to ACN's tort action against Marksteiner.

**Breach of Contract**

4.       Under Tennessee law, the rights and obligations of contracting parties are governed by their written instruments. *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).  The cardinal rule in the construction of contracts is to ascertain the intent of the parties. *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999) (citing *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310 (Tenn. Ct. App. 1984)).  Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms." *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990).

5.       When the agreement is unambiguous, the meaning is a question of law, and the court must enforce the agreement according to its plain terms. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991).  The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975).  The courts are also not "at liberty to relieve parties from their contractual obligations simply because these obligations later proved to be burdensome or unwise." *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47 (citations omitted).  Moreover, the courts cannot make contracts for parties but

can only enforce the contract which the parties themselves have made. *Bradson Mercantile*, 1 S.W.3d at 652 (citing *McKee v. Continental Ins. Co.*, 191 Tenn. 413, 234 S.W.2d 830 (1951)). Finally, whether contractual terms are ambiguous is also a question of law for the court. *Tennessee Consol. Coal Co. v. United Mine Wkrs. of Am.*, 416 F.2d 1192, 1198 (6th Cir. 1969), *cert. denied*, 397 U.S. 964 (1970). The language of a contract is ambiguous if its meaning is susceptible to more than one reasonable interpretation. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

6.     Additionally, in Tennessee, "[a]fter a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1991). This is true even if the agreement expressly specifies that the parties may only modify the agreement in writing, such as in the instant case.[13] *Co-operative Stores Co. v. United States Fid. & Guar. Co.*, 137 Tenn. 609, 195 S.W. 177, 180 (1917). "The parol evidence rule is inapplicable to evidence of oral modification because the rule will 'permit testimony to ... show a subsequent modification to a written agreement. Once admitted, this evidence does not in any way deny what the original agreement expressed; however, it merely demonstrates that the parties may have exercised their right to modify the written agreement.'" *Shah v. Racetrac Petroleum* Co., 338 F.3d 557, 573 (6th Cir. 2003) (quoting *Golden Constr. Co. v. Greene*, No. 83-286, 1987

---

[13]The 2004 Agreement states, "This Agreement constitutes the entire Agreement between the parties hereto, and may not be modified or amended in any manner other than by supplemental *written* agreement executed by the parties to be affected thereby." [*See* Doc. 1-2, p.4 (emphasis added)].

WL 18061, at *1 (Tenn. Ct. App. Oct. 9, 1987) (unpublished)).  There must, however, be evidence that the parties did orally agree to modify the original written agreement to overcome the no oral modification provision.  Here, there is no such credible evidence.  The 2004 Agreement, a valid contract between these parties, will therefore be enforced according to its plain terms.

7.      The Court next concludes that the language of the 2004 Agreement is unambiguous with respect to renewal.  *See Tennessee Consol. Coal Co.*, 416 F.2d at 1198 (whether contractual terms are ambiguous is a question of law for the court).  The pellucid language of the 2004 Agreement states that it "will renew automatically for one-year terms unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term."  [Jt. Tr. Ex. 1 at 1].  It is undisputed that the 2004 Agreement originally went from April 1, 2004, through March 31, 2005, and it is further undisputed that the parties allowed it to automatically renew from April 1, 2005, through March 31, 2006.  The question presented at trial is whether the 2004 Agreement renewed for the term from April 1, 2006, through March 31, 2007.

8.      As to that issue, the Court concludes that, by the plain language of its unambiguous terms, the 2004 Agreement automatically renewed for a second one-year renewal term from April 1, 2006, through March 31, 2007, because MIG both failed to give the contractually required notice of termination more than thirty days before March 31, 2006, and failed to give that notice in the form required by the 2004 Agreement.

9.      In reaching that general conclusion, the Court recognizes that it previously determined in its Memorandum and Order [Doc. 59] filed on August 23, 2007, that Marksteiner's e-mail to Ms. Harris on January 30, 2006, *may* have provided sufficient notice to prevent automatic renewal, even though that e-mail did not use the words "cancel" or "terminate." [*See id.* at 30-31].  Nevertheless, based upon a fully developed record, the Court now concludes that the January 30th e-mail does not terminate the 2004 Agreement for three reasons:  (1) it is not a notice of termination;  (2) it was not sent in the manner prescribed by the 2004 Agreement;  and (3) it was not treated by either party as a notice of termination.

10.      The January 30th e-mail states in pertinent part:

. . .

> The ACN contract with WHDT is due to expire very shortly.  In the past, the old contract has just been allowed to automatically renew even though it contained ambiguous holdover language.  Since the preemption issue has not come up before, no one cared about it.  Since it is being raised now, any renewal contract will have to contain new and appropriate language.
>
> The person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT.  ...

[Jt. Tr. Ex. 28 at 2].  At trial, there was no evidence of any communications about the 2004 Agreement renewal between ACN and MIG after this e-mail until March 9, 2006, other than Ms. Harris's "[f]orget it" e-mail back to MIG [*see* Jt. Tr. Ex. 29].

11.      At most, the January 30th e-mail gave notice of MIG's desire not to renew the 2004 Agreement if the preemption issue was not addressed with "new and appropriate language." [*See* Jt. Tr. Ex. 28 at 2].  However, the Sixth Circuit has held that notice of desire

does not equate with notice of termination with respect to an automatic renewal provision. *Cincinnati Newspaper Guild v. Cincinnati Enquirer, Inc.*, 863 F.2d 439, 442-43 (6th Cir. 1989). As observed by the Sixth Circuit in that case, "[t]he experience of mankind from time immemorial has been that notice of desire is not inevitably tantamount to consummation of desire." *Id.* at 442. Thus, the January 30th e-mail does not comprise a notice of termination.[14]

12. Additionally, neither MIG nor ACN treated the January 30th e-mail as a notice of termination. Most certainly, there is no proof in this record that ACN ever considered the January 30th e-mail as a notice of termination. But even more importantly, MIG never considered the e-mail as a notice of termination. In his June 30, 2006, letter to Harris Bagley, Marksteiner stated that he gave "timely notifi[cation]" in March [*see* Jt. Tr. Ex. 42]. Similarly, in his July 5, 2006, e-mail to Cross, headed "official letter of notice to [Jewelry Television]," Marksteiner made no mention whatsoever of the January 30th e-mail [*see* Jt. Tr. Ex. 13]. Instead, from January 2006 through July 2006, MIG continued to invoice ACN "as per contract." [Jt. Tr. Ex. 45]. And MIG continued to air the Jewelry Television feed,

---

[14]In its Memorandum and Order [Doc. 59] filed on August 23, 2007, this Court relied on *Oakland Press Co. v. N.L.R.B.*, 606 F.2d 689 (6th Cir. 1979), in finding that MIG had created a genuine issue of material fact as to whether the January 30th e-mail may have prevented automatic renewal. However, the Court observes that the *Oakland Press* case constituted only the appellate court's determination that there was sufficient evidence in the record to support an administrative law judge's holding that a letter constituted sufficient notice of a desire to terminate, which was the language of the contract at issue in that case. As such, the Court does not feel constrained by the holding of *Oakland Press* in reaching the result it has based upon the Sixth Circuit's decision in *Cincinnati Enquirer, supra,* and the now fully developed record in this case.

and ACN continued to pay MIG's invoices. In other words, after March 31, 2006, both parties conducted themselves as if the 2004 Agreement had in fact renewed.

13. The Court further concludes that the January 30th e-mail was not sent in the manner specifically prescribed by the 2004 Agreement. It was not sent by certified mail, with return receipt requested, by hand delivery, or by any other delivery service that provides written delivery verification, such as FedEx or UPS.[15] Marksteiner testified that this notice provision of the 2004 Agreement was specifically negotiated; yet, that provision says nothing about delivery by e-mail, even though Marksteiner specifically requested that it be included. Consequently, Marksteiner knew or should have known that e-mail was insufficient. Thus, the manner in which the January 30th e-mail was sent disqualifies that document as proper notice pursuant to the 2004 Agreement.

14. With respect to Marksteiner's e-mail to Caldwell dated March 9, 2006, the Court has already concluded that this e-mail notice did not constitute timely notice of termination under the 2004 Agreement:

> Moreover, if the only written notice ever received by ACN was Marksteiner's e-mail sent on March 9, 2006, then that notice was sent well within the thirty-

---

[15]In its Memorandum and Order [Doc. 59] filed on August 23, 2007, denying ACN's motion for partial summary judgment, the Court quoted the language in the 2004 Agreement that written notice may be "by other delivery service that provides written delivery verification" and then concluded that "MIG has raised an additional issue of material fact that e-mail notice is sufficient under the 2004 Agreement because Marksteiner's January 30th e-mail was responded the very next day" and "[t]he response ... may comprise 'delivery verification' under the 2004 Agreement." [*Id.* at 33]. Upon further review of the notice language of the 2004 Agreement, and having considered the testimony and record from the trial of this action, the Court now concludes that the 2004 Agreement requires that the delivery service itself must provide for written notification, such as FedEx or UPS.

> day deadline established by the 2004 Agreement, thereby supporting ACN's argument that the contract was automatically renewed for a second term from April 1, 2006, through March 31, 2007.

[Doc. 59 at 29-30]. Furthermore, just as with the January 30th e-mail, the parties continued to conduct business as usual after that e-mail was sent – Jewelry Television remained on the air at WHDT, MIG continued to invoice ACN "as per contract," and ACN continued to pay those invoices. Finally, for the same reasons discussed with respect to the January 30th e-mail, the Court concludes that this e-mail was not a sufficient form of notice under the specifically negotiated provision of the 2004 Agreement.

15.    Because MIG did not terminate the 2004 Agreement as required by the specific terms therein, the Court further concludes MIG has breached the 2004 Agreement and that ACN is entitled to compensatory damages, the specifics of which will be discussed shortly.

**Procurement of Breach of Contract**

16.    In addition to its cause of action against MIG for breach of contract, ACN seeks treble damages against Marksteiner individually for procurement of breach of contract pursuant to the common law of Tennessee and Tennessee Code Annotated § 47-50-109.[16]

---

[16]This statute provides as follows:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109.

The elements of this cause of action under the statute are the same as under the common law, which are as follows: (1) there must be a legal contract; (2) the wrongdoer must have knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) there must be a breach of the contract; (6) the act complained of must be the proximate cause of the breach of the contract; and (7) there must have been damages resulting from the breach of the contract. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 354-55 (Tenn. Ct. App. 1999). Moreover, the burden of proof necessary to establish these elements must be by "clear and convincing evidence." *Id.* at 359 (citations omitted). However, once this showing is made, imposition of treble damages is mandatory. *Continental Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 229 (6th Cir. 1984).

17. The first requirement is the existence of a legal contract. Here, the Court has already concluded, for the reasons previously articulated, that the 2004 Agreement, a legal contract, had been renewed on April 1, 2006, for an additional one-year term to March 31, 2007.

18. The second element is that the wrongdoer must have known of the existence of the contract. In this case, Marksteiner was acutely aware of the 2004 Agreement because, among other things, he actually signed it on behalf of MIG. This element is therefore satisfied by ACN.

19. The third element is that the wrongdoer must have intended to induce the contract's breach. This element too is met by ACN because Marksteiner clearly intended to

induce the breach of the 2004 Agreement when he instructed MIG to discontinue the Jewelry Television feed on June 30, 2006 [*see* Jt. Tr. Exs. 3 and 5]. The evidence in this case demonstrates that Marksteiner knew that, since March 2006, MIG had been airing the Jewelry Television feed, that MIG had been invoicing ACN "as per contract," and that ACN had been paying MIG, including payment for service during July 2006, all of which MIG had accepted. The evidence in this case further demonstrates that Marksteiner knew that the purpose of the 2004 Agreement was to provide airtime for ACN in the West Palm Beach area and his instructions to MIG in his capacity as licensee, which he promptly acted upon as the President of MIG by terminating Jewelry Television's feed on July 1, 2006, were objectively intended to cause the result they did – a breach by MIG.

20. The fourth element is that the wrongdoer must have acted maliciously. In this context, malice is the willful violation of a known right. *Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105, 121 (6th Cir. 1977). Moreover, this type of malice does not require ill will or spite toward plaintiff. *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 389 (M.D. Tenn. 1993); *see also Hutton v. Watters*, 132 Tenn. 527, 532 ("If an act be hurtful to another, intentional, and without legal justification, it is malicious in the true legal sense."). In this case, the proof establishes by clear and convincing evidence that Marksteiner's letter of June 30, 2006, which was not received by ACN until the July 3, 2006 e-mail, terminated the Jewelry Television feed without any advance or contemporary notice, leaving ACN to discover the termination from its customers. Furthermore, Marksteiner had no legal basis on which to instruct MIG to terminate the Jewelry Television feed, the Court

having already found that Marksteiner's purported concern about ACN's return rates not supported by the evidence presented at trial. Instead, the evidence clearly establishes that the return rate, which had been much higher in the past than it was in the Spring of 2006, had not established any previous basis for terminating the feed or even raising the issue of termination of the feed. It is also curious that, immediately following MIG's termination of the feed, Marksteiner authorized MIG's board member Cross to negotiate an agreement with ACN; yet, return rates were not even mentioned in those discussions. The Court agrees with ACN that the issue of the return rates as a basis for this action is nothing more than a "ruse." [*See* Doc. 74, p.27].

21. The fifth element is that the contract must have been breached. With respect to this element, the Court has already determined, in previous conclusions of law, that the 2004 Agreement was breached by MIG.

22. The sixth element is that the act complained of must have been the proximate cause of the breach. The only proof in this case is that MIG terminated its contract with ACN based solely on Marksteiner's instructions as the licensee. There is no proof in this record that there was any other act which caused MIG to breach its contract with ACN.

23. The final requirement is that there must have been damages resulting from the breach. As set forth in the remaining paragraphs of this opinion, the Court has determined that ACN is due damages in the amount calculated therein.

24. Based on the proof in this record, the Court concludes that ACN has proven each of the elements of procurement of breach of contract by Marksteiner by clear and

convincing evidence.  Accordingly, the Court concludes that Marksteiner is liable to ACN for treble damages.

**Damages**

25.     Exhibit C to the 2004 Agreement provides not only a method to calculate damages for preemption but also "for any failure of Affiliate or the cable to air ACN programming ... ."  [*See* Jt. Tr. Ex. 1, p.9].  Therefore, given the fact that ACN is insisting on a strict interpretation of all provisions of this contract, the Court is likewise compelled to conclude that the damages provision shall be enforced as specifically negotiated by the parties in this contract.  In other words, this provision shall be applicable to MIG's failure to air Jewelry Television from July 1, 2006, through March 31, 2007.

26.     According to the Court's calculations, utilizing Schedule C for those weekend days when Jewelry Television was being aired on a 24-hour basis, a daily computation of damages is as follows:

| 12 a.m. to 6 a.m. | 6 hrs. x | $52.32 | $313.92 |
|---|---|---|---|
| 6 a.m. to noon | 6 hrs. x | $88.10 | 528.60 |
| noon to 6 p.m. | 6 hrs. x | $103.88 | 623.28 |
| 6 p.m. to midnight | 6 hrs. x | $112.49 | 674.94 |
| | | | $2,140.74 |

ACN is thus entitled to contract damage of $2,140.74 for each day of the weekend through the term of the contract.  Moreover, MIG is responsible for reimbursement in a similar manner for 17 hours of each workday, as follows:

| 12 a.m. to 6 a.m. | 6 hrs. x $52.32 | $ 313.92 |
|---|---|---|
| 6 a.m. to noon | 6 hrs. x $88.10 | 528.60 |
| noon to 5 p.m. | 5 hrs. x $103.88 | 519.40 |
| | | $1,361.92 |

27. From the period of July 1, 2006, through March 31, 2007 inclusive, the Court counts 79 weekend days and 195 workdays. Accordingly, the Court calculates that MIG is responsible for total reimbursement as follows:[17]

| | | | |
|---|---|---|---|
| Weekend days | 79 days x | $2,140.74 | $169,118.46 |
| Workdays | 195 days x | $1,361.92 | $265,574.40 |
| | | | $434,692.86 |

28. The Court trebles this amount to determine ACN's judgment against Marksteiner for procurement of breach of contract. Accordingly, ACN is entitled to $869,385.72 from Marksteiner, which represents treble damages of $1,304,078.58 offset by the $434,692.86 for which MIG is liable for breach of contract

29. ACN is additionally entitled to $21,703.95 from MIG which represents the $51,000.00 July 2006 Base Payment made by ACN to MIG netted against the $29,296.05 Adjusted Payment for June 2006, which was not made.

30. Finally, pursuant to the specific provision of the 2004 Agreement, ACN will be entitled to reasonable attorney fees, travel expenses, and the costs of this litigation [*see* Jt. Tr. Ex. 1 at 3]; however, the Court will allow ACN to submit its motion to recover those

---

[17]The Court recognizes that Schedule C to the parties' agreement further provides that those "rates will adjust on a monthly basis based upon a pro rata adjustment for increases or decreases in the subscriber count." [Jt. Tr. Ex. 1 at 9]. Accordingly, the parties may submit agreed calculations or their respective calculations regarding any deviation based on that factor within 10 days of entry of the Court's judgment and the Court may amend its findings pursuant to Federal Rule of Civil Procedure 52(b).

fees, expenses, and costs through the filing of a motion and supporting documentation as provided by Fed. R. Civ. P. 54(d)(2).

Order accordingly.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE